Gertrude Brooks SCHUYT, Plaintiff,

v.

ROWE PRICE PRIME RESERVE FUND, INC., T. Rowe Price Associates, Inc., Carter O. Hoffman, Edward A. Taber III and George J. Collins, Defendants.

No. 80 Civ. 506 (RJW).

United States District Court, S.D. New York.

July 1, 1987.

Wolf Haldenstein Adler Freeman & Herz, New York City (Daniel W. Krasner, Jeffrey G. Smith, Sindy R. Udell, of counsel), Stull, Stull & Brody, New York City (Robert Stull, of counsel), for plaintiff.

Shereff Friedman Hoffman & Goodman, New York City, for defendant Rowe Price Prime Reserve Fund, Inc.; Jerome Marshak, Robert D. Helfand, of counsel.

Pollack & Kaminsky, New York City, for defendants T. Rowe Price Associates, Inc. Carter O. Hoffman, Edward A. Taber III, and George J. Collins; Daniel A. Pollack, Martin I. Kaminsky and Henry H. Hopkins, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

This matter is before the Court for a decision on the merits following a two-week bench trial. Plaintiff, a shareholder in the Rowe Price Prime Reserve Fund, Inc. ("Prime Reserve Fund" or the "Fund") brought this action pursuant to the Investment Company Act of 1940, as amended, 15 U.S.C. § 80a-1 et seq. ("ICA"), asserting three claims for relief. Count I, asserted against defendants T. Rowe Price Associates, Inc. ("Price Associates" or the "Adviser"), raises a claim for excessive fees under section 36(b) of the ICA. 15 U.S.C. § 80a-35(b). Count II, brought against all defendants, is based on diversity of citizenship and alleges breach of fiduciary duty under state law. Count III, also asserted against all defendants, alleges violations of section 20(a) of the ICA, 15 U.S.C. § 80a-20, and Rule 20a-1 promulgated thereunder, 17 C.F.R. § 270.20a-1, in connection with a proxy statement disseminated to Fund shareholders to solicit their approval of a proposed investment advisory agreement for 1980 and 1981.[1]

After consideration of the testimony presented at trial, the evidence and exhibits introduced, the proposed findings of fact and conclusions of law of the parties, and the applicable law, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P.[2]

## BACKGROUND

Plaintiff Gertrude Brooks Schuyt, a resident of the State of New York, became a shareholder of defendant Prime Reserve Fund on April 24, 1979 and has remained a shareholder at all relevant times. Defendant Prime Reserve Fund, a Maryland corporation, is an open-end, diversified management investment company registered under the ICA. The Fund, which continuously offers its shares of stock to the public,[3] invests in prime money market instruments and is commonly known as a "money market fund."[4] During the rele-

---

1. This Court has subject matter jurisdiction of this action pursuant to section 44 of the Investment Company Act of 1940, 15 U.S.C. § 80a-43, and 28 U.S.C. § 1332. This Court also has pendent jurisdiction of the common law counts alleged in the complaint.

2. The Court adopts the stipulated facts of the parties as submitted in the joint pretrial order. These facts are incorporated herein and will only be repeated to the extent necessary to make a complete presentation in the Court's findings of fact.

   The stipulated time period at issue in this case is April 24, 1979, the date plaintiff first became a shareholder of Prime Reserve Fund, through February 25, 1981, the date the Investment Ad-

visory Agreement for 1981 was approved by the directors of Prime Reserve Fund. This time period includes two complete contract years, 1979 and 1980, and the renewal process for the 1981 contract which became effective on May 1, 1981.

3. The shares of the Fund are redeemable at any time at net asset value and are offered at net asset value. The Fund maintains its net asset value at ten dollars per share.

4. An important aspect of money market funds is the services they offer to shareholders, including inter alia, ease of entry and exit, exchange for shares of other funds by telephone or telegram, transfer of shares to other owners, re-

vant time period in this litigation, the fund grew in size from about $200 million in net assets to about $2 billion in net assets.[5] During this time, the fees paid by the Fund to the investment adviser, which were based on a set percentage of the Fund's net assets, correspondingly increased from $1,734,755 in 1979, to $4,331,360 in 1980, and to $8,362,250 in 1981.

Defendant Price Associates, also a Maryland corporation,[6] served during this time as the investment adviser to Prime Reserve Fund pursuant to Investment Advisory Agreements ("Agreement") between the Adviser and the Fund.[7] Defendant Carter O. Hoffman ("Hoffman") was a director and Chairman of the Board of Prime Reserve Fund and the Senior Vice President, a shareholder, and a director of Price Asso-

ciates. Defendant Edward A. Taber ("Taber") was a director and President of Prime Reserve Fund. Taber also served as Chairman of the Advisory Committee of Prime Reserve Fund [8] and was a Vice President and a shareholder of Price Associates. Defendant George J. Collins ("Collins"), presently the President and Chief Executive Officer of Price Associates, was the Vice President, a shareholder, a director, and head of the Fixed Income Division of Price Associates during the time at issue in this litigation. He was also a director and Vice President of Prime Reserve Fund.

The composition of the Board of Directors of Prime Reserve Fund changed during the time period from the approval of the 1979 Agreement to the approval of the 1981 Agreement. On February 15, 1979,

---

demption by telephone or telegram, and responses to shareholder inquiries. Money market funds often have shareholders merely depositing their funds temporarily to maximize their short-term return on excess cash. Thus, these accounts often fluctuate widely, with frequent deposits and withdrawals. These special characteristics of money market funds distinguish them from equity funds, pensions, and private counsel accounts, and tend to make a comparison to the fees charged by these other investment vehicles of little value. For an interesting discussion of the money market fund industry and its growth during this general time period, *see Gartenberg v. Merrill Lynch Asset Management, Inc.,* 528 F.Supp. 1038, 1041–42 (S.D.N.Y. 1981), *aff'd,* 694 F.2d 923 (2d Cir.1982).

**5.** To service the shareholders of Prime Reserve Fund, the Adviser maintained a staff which had to be increased dramatically as the assets of the Fund grew during this time. In 1980, for example, the number of shareholders of the Fund increased from about 57,000 to about 100,000. To meet the demands of such growth, the Adviser added approximately fifty new employees to service the shareholders. Edward A. Taber, the president of the Fund, estimated that the investment staff alone increased by thirty to forty percent over the three year period. Tr. at 924.

**6.** During the time period of this litigation, Price Associates was a private corporation. Its shares were almost entirely owned by its employees.

**7.** Pursuant to the written agreement between the parties, Price Associates performed investment advisory, administrative and other services for the Fund and in return received a percentage of the amount of average net assets of the Fund. Price Associates has performed these services for the fund since at least January 28,

1976, the date of the original Investment Advisory Agreement. The Board of Directors of Prime Reserve Fund approved the initial Investment Advisory Agreement and each successive Investment Advisory Agreement and recommended approval to the shareholders of the Fund, who approved all Investment Advisory Agreements.

Prior to May 1, 1980, the Investment Advisory Agreement set the fee schedule at .4% of Prime Reserve Fund's average daily net assets. From May 1, 1980 until April 30, 1981, the fee schedule provided for an annual fee of .4% on the first billion dollars of net assets, and .35% on all net assets in excess of one billion dollars. Effective May 1, 1981, the fee schedule provided for an annual fee of .4% on the first billion dollars of net assets, .35% on the next $500 million of net assets, .275% on the next $500 million of net assets, and .25% on all net assets in excess of two billion dollars.

Generally, the fund directors met and discussed renewal of the Investment Advisory Agreement in January and February of each year, voting on the agreement at the February board meeting. They also approved the proxy statements that were sent to shareholders in March for an April shareholders' meeting, and the agreement went into effect on May 1.

**8.** The Investment Advisory Committee is the organizational entity of seven to nine people at Price Associates that handled portfolio management for Prime Reserve Fund during the time at issue in the litigation. As president of the Fund, Taber was responsible for conducting the annual meeting of shareholders, presenting the investment review and performance at each Board meeting, and chairing the Investment Advisory Committee. In 1980, Taber's time records indicate that he spent approximately 63.75% of his time working on Fund activities.

the date the 1979 Agreement was approved, the Board of Directors of the Fund consisted of three inside or interested directors, Hoffman, Taber, and Collins, and two outside or independent directors, Hubert P. Vos ("Vos") and Lawrence P. Naylor, III ("Naylor").[9] On February 27, 1980, the date the 1980 Agreement was approved, the directors of the Fund were Hoffman, Taber, Collins, Vos, and Anthony W. Deering ("Deering"). Deering had become an outside director in April 1979, replacing Naylor who had resigned. On February 25, 1981, the date the 1981 Agreement was approved, the directors of the Fund were Hoffman, Taber, Collins, Vos, Deering, and two new outside directors, Dr. Karen N. Horn ("Horn") and F. Pierce Linaweaver ("Linaweaver").

During all relevant times, the independent directors of Prime Reserve Fund had their own counsel, Stanley J. Friedman ("Friedman"), a partner in the law firm of Shereff, Friedman, Hoffman & Goodman. Friedman had been counsel to Prime Reserve Fund since the Fund was organized in 1975. During 1979 through 1981, Friedman spoke weekly or biweekly with the outside directors. In addition, he furnished the directors with detailed written and oral advice regarding their duties, including their responsibilities in evaluating the Agreements between the Adviser and the Fund. Friedman apprised them, on a continuing basis, of pertinent legal developments relating to mutual funds, including their responsibilities under section 36(b) of the ICA.[10]

The Fixed Income Division of Price Associates was responsible for the credit and investment analysis for the nonequity mutual funds managed by the Adviser, including Prime Reserve Fund. This Division was directed by Collins, with Taber as Assistant Director. Both had extensive experience in the fixed income securities business. Approximately 24–26 individuals worked in the Fixed Income Division. With regard to the Fund, the specific function of the Fixed Income Division was to provide research and analysis at the weekly meeting of the Investment Advisory Committee.[11] The directors of the Fund received periodic reports on the functioning and work of the Fixed Income Division.[12]

9. "Inside" or "interested" directors are directors who are affiliated with Price Associates while "outside" or "independent" directors are directors who have no connection to Price Associates.

10. A number of other individuals at Price Associates were involved in providing advisory services to the Fund or providing information to the Board of Directors. Howard P. Calhoun ("Calhoun") was a Vice President of Price Associates, and a director of its mutual funds division. Calhoun provided the directors of the Fund with extensive information regarding the Fund. E. Kirkbride Miller ("Miller"), Chairman of the Board and President of Price Associates, retired from his position as Chief Executive Officer in early 1981. Curran W. Harvey ("Harvey"), previously the Vice Chairman of Price Associates, succeeded Miller as Chief Executive Officer. Cornelius Bond ("Bond") was a Vice President and director of Price Associates. He was also a member of the Adviser's Finance Committee, becoming Chairman of this committee in early 1980. Alan Schreiber ("Schreiber") was a Vice President of Price Associates and a member of the Fixed Income Division. Schreiber also served on the Investment Advisory Committee for the Fund. Alvin M. Younger, Jr. ("Younger") was Controller and Assistant Treasurer of Price Associates.

11. The Fixed Income Division conducted extensive research into the types of instruments and specific paper in which the Fund invested. This paper included certificates of deposits of domestic banks, certificates of deposit of foreign banks throughout the world, commercial paper, bank acceptances, and all other forms of money market instruments. Employees of Price Associates traveled world-wide to meet with specific issuers to locate and obtain the best credits and highest quality issues available.

The most important investment considerations for Fund shareholders were yield and safety, factors which require careful evaluation and the exercise of judgment regarding the creditworthiness of the issuer. Selection of the proper maturity is important to maintaining the net value per share. The desire to see the Fund grow (in order to enhance its ability to be a significant player in the market) and the fear of volatile interest rates and asset levels (which could result in the Fund being forced to sell instruments in a depressed market to cover redemptions) caused the Fund's portfolio managers to undertake constant examination of economic and market conditions.

12. For example, at the February 1980 Board meeting, Collins, Taber, and Schreiber gave a detailed presentation of the function of the Fixed Income Division and Taber explained the role of the Investment Advisory Committee.

### History of the Prime Reserve Fund

The Prime Reserve Fund was organized on October 31, 1975. Price Associates was retained as the Fund's investment adviser pursuant to an Investment Advisory Agreement between the Fund and the adviser dated January 28, 1976. In the early years of the Fund's existence, the Adviser absorbed all of the Fund's operating expenses and in 1976 voluntarily waived payment of the management fee in order to help the Fund maintain a competitive yield in the industry. As of December 31, 1976, the Fund had 590 shareholder accounts to service, with the account size averaging $86,000. From 1976 through the beginning of 1979, the Fund grew at a moderate pace.[13] During this time, the Fund operated at a loss for the Adviser. However, by the end of 1979, yield rose to unprecedented levels and the Fund grew enormously.[14] By December 31, 1979, the Fund had 57,343 shareholder accounts to service, with the account size averaging $12,494. Throughout this time, the Investment Advisory Agreement, which was extended for a year at the February 15, 1979 Board meeting, provided for a fee to the Adviser of .4% of the Fund's average daily net assets.

### Plaintiff Becomes a Shareholder

On April 24, 1979, plaintiff became a shareholder of Prime Reserve Fund. At this time, the net assets of the Fund were approximately $300 million. Plaintiff conceded in her deposition that she believed the fee of .4% was fair and reasonable throughout 1979. Indeed, many comparable money market funds were charged .5% in 1979.

The independent directors of the Fund met privately with their attorney Friedman on October 30, 1979, at Cross Keys Inn in Maryland to discuss the status of the Fund, its recent growth, and its expenses, including marketing expenses. As noted above, the sudden and historically unprecedented rise in interest rates during late 1979 and early 1980 led to an astonishing rate of growth for the Fund. This extraordinary growth in asset levels, reaching approximately $700 million by the end of 1979, had not been anticipated by the directors or the Adviser.

At this point in time, the directors and the Adviser became increasingly concerned about the volatility and the growth of the fund. With regard to volatility, they feared that fluctuations in interest rates and inflation might cause a sudden change in the level of the Fund's net assets. With regard to growth, they believed that it was in the best interest of the Fund to increase as much as possible as such growth would permit the Fund to invest in larger, better quality instruments and would enhance the Fund's reputation.

### Renewal Process for 1980 Investment Advisory Agreement

In light of the significant growth of the Fund during the fall and winter of 1979, Calhoun, Vice President of Price Associates, suggested to the Executive Committee of Price Associates on January 4, 1980 that the Adviser recommend a reduction in its advisory fee to the Fund from the .4% to .35% when the net asset level reached $1 billion. On January 7, 1980, the Executive Committee discussed and approved the fee break recommendation. The Board of Directors of Price Associates, on January 10, 1980, also approved the fee break proposal.

On January 15, 1980, Friedman sent to the directors of the Prime Reserve Fund his annual memorandum on the factors they should consider in evaluating the Investment Advisory Agreement. Friedman advised that the directors should consider the following:

---

**13.** By December 31, 1977, the Fund had 1,187 shareholder accounts to service with an average account size of $28,500. The number of accounts increased to 8,338 by the end of 1978 with an average account size of $18,000.

**14.** On January 1, 1979, the Fund's asset level was approximately $150 million. This level increased to $200 million by February 15, 1979, $300 million by April 24, 1979, and $700 million by December 31, 1979.

1. The requirements of the Fund in the areas of investment supervisory and administrative services.

2. The quality of the services rendered and the results achieved by the investment advisor in the areas of investment supervisory and administrative services.

3. The size of the fees paid to the investment advisor measured in relationship to the extent and quality of services rendered to the Fund, and to the fees charged by other organizations providing comparable investment advisory services.

4. The organizational capabilities and financial condition of the investment advisor measured in terms of the needs of the Fund on a continuing basis.

5. The possibility that services of the type required by the Fund might be better obtained from other organizations.

6. Conditions and trends prevailing generally in the economy, the securities markets and the mutual fund industry.

7. The historical relationship between the Fund and the investment advisor.

8. Other factors that might appear to the directors to be relevant.

Exhibit W, at 5.

In this memorandum, Friedman also advised the directors that they might wish to consider, although they were not legally required to do so, "the range of profitability that can reasonably be expected to accrue to the advisor from the operation of the Fund." Exhibit W, at 10. Prior to January 1980, Friedman did not advise the directors concerning the appropriateness of asking for information concerning profitability. It was only in January that Friedman first learned that Price Associates was maintaining product-line cost information.

Senior management of Price Associates had been concerned about providing the product-line profitability data from the cost accounting system because this system had been created in 1966 to monitor counsel (as opposed to mutual fund) fees. Management considered this old system to be unreliable and outmoded since it allocated common expenses in an arbitrary way.[15] They also feared that it might erroneously focus the directors on an inappropriate "cost plus" analysis which could have a negative impact on the ability of the Fund to obtain top quality employees. Notwithstanding the concerns of the Adviser, the Board of Directors of the Fund pressed their request for the data.[16]

On January 18, 1980, the Executive Committee of Price Associates decided to provide to the directors the product-line profitability data that its cost accounting system had generated.[17] Calhoun supplied this in-

15. Beginning in mid-1979, the Adviser began to consider revising its internal cost accounting system in light of the unreliability of the old system. In discussions with Friedman during February of 1980, the Adviser explained that it was reorganizing its internal cost accounting system. The results from that new Product Line Profitability System ("PLPS") were given to the directors in connection with their review of the 1981 Investment Advisory Agreement. The internal cost accounting system of Price Associates, both the one in existence from 1966 to 1980 and the later PLPS system, was a "full cost" or "fully distributed cost" accounting system. All cost accounting systems which operate on a "fully distributed cost" basis are subject to great potential variation in results depending on the assumptions underlying the system. Consequently, the reliability of such data is questionable, particularly when one is attempting to compare one mutual fund against other funds or other types of products and services.

In the spring of 1980, the Adviser engaged Price Waterhouse & Co. to review and evaluate the PLPS, which was in the process of being implemented. In a written report dated July 1, 1980, which was delivered to the Board of Directors in the middle of July, Price Waterhouse observed that the precision and reliability of cost accounting systems often suffer in practical application. Price Waterhouse also noted that the reasonableness of the PLPS output is dependent on the time estimates of employees and the assumptions underlying the system.

16. In mid-January 1980, Henry H. Hopkins, Esq., Price Associates' inside counsel, informally surveyed the mutual fund industry concerning the profitability information generally provided to directors. He found that some advisory organizations only provided directors with profitability data for the adviser itself while others provided profitability broken down by individual fund.

17. In January 1980, Price Associates had profitability data for the first nine months of 1979, but not yet for the full year. The Executive Committee had reservations concerning the accuracy of the information due to the inherent

formation to the directors in a memorandum that explained that the system did not produce accurate data and was presently in the process of being improved. Calhoun indicated that the figures showed a pre-tax, pre-advertising operating margin of forty to sixty percent for the first nine months of 1979.[18]

A meeting of the Board of Directors of Prime Reserve Fund was held on January 23, 1980. At this meeting, the directors were given an extensive Agenda book containing detailed information about the fund and its most recent developments. Among the documents in the Agenda book was the proposed proxy statement to be mailed to shareholders of the Fund for their annual meeting, to be held on April 12, 1980. At this meeting, the directors approved the proposed statement. They also discussed the Calhoun memorandum recommending a fee break. In connection with the fee proposal, the directors requested further information from the Adviser on whether the advisory fee was competitive, whether there were economies of scale, and whether the Adviser's profits were reasonable. The directors suggested limiting the Investment Advisory Agreement to one year, as opposed to two years, so that annual growth of the Fund could be taken into account.

Following this Board meeting, Calhoun had an in-depth conversation with Vos in response to certain questions that Vos had raised at the meeting. Calhoun provided Vos with additional profitability data covering the inception of the Fund through the first nine months of 1979 and explained the reservations that the Adviser had concerning the accuracy of figures generated by

the internal cost accounting system. In response to inquiries by Deering during the January meeting, Calhoun met with Deering and the Adviser provided all directors with information concerning the expense ratio of Prime Reserve Fund relative to other large money market funds. The data indicated that the expense ratio of the Fund was competitive with others in the industry. Finally, on February 20, 1980, the Adviser, following up on requests made at the January meeting, provided the directors with detailed data on the revenue, expenses, and profits of the six mutual funds it managed and its counsel division. This data indicated that the Adviser had a pre-tax profit margin on the Fund of approximately fifty-seven percent during the first nine months of 1979. The Adviser again cautioned the directors about the limited usefulness of the information.

On February 26, 1980, the night before the February Board meeting, Friedman met with Vos and Deering over dinner to discuss the factors that should be considered in approving the 1980 Agreement. The Board meeting was held the following day with all directors attending.[19] Prior to this meeting, the directors had been given additional information, including the proposed new Investment Advisory Agreement, a description of the functions of the Fixed Income Division, a summary of the allocation of expenses between the Fund and the Adviser, and a comparison of the Price Associate fee to fees of other advisers. At the meeting, the independent directors considered the proposed 1980 Agreement and discussed the Agreement in relation to the factors outlined by Friedman in his January memorandum.[20] The

inadequacies of the cost accounting system. Friedman did not suggest that the directors receive year-end profitability figures when they became available, nor did the directors request these figures despite the fact that the Fund was growing rapidly at this time.

18. Calhoun also observed in his memorandum that the margins for 1977 and 1978 were 4% and –7% respectively. The memorandum also discussed other factors, including entrepreneurial risk, which the directors might consider when judging the fee.

19. Horn and Linaweaver, who were being proposed as additional independent directors, also attended this meeting by invitation.

20. At the meeting, Friedman advised the directors as follows:

The basic test is whether the directors can satisfy themselves that the information that is available provides a reasonable basis for judgment that the benefits of the economies of scale are, in fact, shared by the advisor with the Fund (e.g., by appropriately fixed "breakpoints"). This does not mean that the directors must impose on the Associates a de-

directors were also aware that, even after the Agreement was approved, they had the right to terminate the 1980 Investment Advisory Agreement at any time. Following the extensive discussion at the February 1980 Board meeting, the directors of the Fund approved the 1980 Agreement. The Agreement, which was to run for a period of one year, contained a fee break at $1 billion which lowered the fee from .4% to .35%.[21]

In March, 1980, the Fund proxy statement that had been approved by the directors was mailed to the shareholders of the Fund, including plaintiff. At the annual meeting of the shareholders of the Fund on April 17, 1980, the shareholders overwhelmingly approved the 1980 Investment Advisory Agreement.[22]

### Renewal Process for 1981 Investment Advisory Agreement

Throughout 1980, the Fund continued to grow at a rapid pace, reaching a net asset level of $1.4 billion by December 31, 1980. During this time, the directors received monthly reports on the Fund's growing net asset level. Upon request, the directors could receive asset level information at more frequent intervals.

The directors of all funds managed by Price Associates met on October 31, 1980. In connection with this joint meeting, all of the directors were given an Agenda book containing information about fee arrangements within both Price Associates and the mutual fund industry, services rendered by Price Associates, and the Investment Advisory Agreements · between the various

funds and the Adviser.[23] The minutes of this joint meeting reflect that an extensive discussion occurred among all of the directors concerning industry practices with respect to advisory fees and services, the nature of advisory services, and the reason for different funds being charged different fees. The minutes also reflect that the Prime Reserve Fund directors were interested in knowing whether profitability figures should be considered in determining the reasonableness of the Adviser's fee. Friedman advised the directors that if they believed such information should be considered, they should request the information from the Adviser.

Price Associates sent a memorandum to the Fund directors on January 13, 1981, proposing that a fee break be instituted in accordance with its historic policy of providing such breaks as funds grew. The proposal would reduce the fee from .35% to .30% when the net asset level reached $1.5 billion.

This proposal was discussed in depth at the January 21, 1981 meeting of the Board of Directors of the Fund. In connection with this meeting, the directors were again given an Agenda book containing detailed information about the Fund's performance and the advisory fee. Discussing the proposed fee break, the independent directors requested the PLPS data and were informed that such data would be made available at the February meeting. The directors agreed to postpone discussion of this topic until the February meeting and requested that prior to the meeting they be supplied with the following information: 1.

tailed cost accounting system that will show to the penny the amount of profit arising out of the operation of the Fund; but it does mean that it is not inappropriate for the directors to request such information about direct and indirect costs (and the related accounting assumptions) as would be necessary to enable them to make a business judgment about the range of profitability that can reasonably be expected to accrue to the advisor from the operation of the Fund.
Exhibit AL, at 11. Harvey again cautioned the directors about the unreliability of the old cost accounting system.

**21.** This fee was not merely competitive to fees charged by other advisers but was actually on

the low side of fees charged by others in the money market industry.

**22.** The vote in favor was over 48 million shares, or 99% of all shares voted. By April 25, 1980, the net assets of the Fund had risen to approximately $1 billion.

**23.** The directors had previously received a series of memoranda explaining the applicable statutory requirements regarding Investment Advisory Agreements, the procedures for terminating such agreements, and the method of paying for advisory services.

the profitability data generated from the new PLPS; 2. the projected expenses at net asset levels of $1.5 billion, $2 billion, and $2.5 billion; 3. Price Associate's recommendation regarding fee breaks at each of these net asset levels; 4. the December 31, 1980 Arthur Lipper & Associates' report on money market funds [24]; 5. Price Associate's advertising budget; and 6. an endorsement from Price Waterhouse & Co. as to the utility of the PLPS data. At the January 1981 Board meeting, the directors also reviewed and approved for mailing the proposed proxy statement for the 1981 Prime Reserve Fund shareholders' meeting.

On February 11, 1981, Friedman sent the directors of the Fund his annual memorandum reviewing the factors to be considered prior to approving an advisory fee between the Adviser and the Fund.[25] Friedman reported that the Securities and Exchange Commission had adopted Rule 12b–1 on October 28, 1980, and advised the directors in detail about that rule and its impact upon their deliberations. Friedman told the directors that the rule did not bar them from reviewing and informing themselves about distribution expenses, but rather only barred them from allowing the adviso-ry fee paid to the Adviser to include payment for those expenses.[26]

Price Associates, on February 12, 1981, sent to the directors of Prime Reserve Fund the long awaited PLPS data, together with a report from Price Waterhouse & Co. and additional commentary about the new accounting system. The PLPS showed profitability data for 1980 on a product-line basis. Subsequently, the independent directors of the Fund requested that they see the data both with and without distribution expenses.[27]

At around this time, the Adviser reviewed public data regarding the profitability of other mutual fund advisers to determine if a typical pre-marketing/pre-tax margin or a typical after-market/pre-tax margin existed in the industry. The Adviser concluded that its overall profit margin was comparable to, indeed lower than, others similarly situated in the industry.

At the request of the independent directors, the Adviser, on February 17, 1981, supplied the directors with a break-down of its distribution expenses by product line. Two days later, the independent directors were also given a *pro forma* profitability analysis for 1981 that had been requested at the January 1981 meeting.

**24.** The Lipper rankings of comparative yields for money market funds are heavily relied on by those in the money market industry for statistics on the various funds.

**25.** At the request of one of the directors, the memorandum was marked to show changes from the previous year's memorandum. With regard to profitability, the 1981 memorandum stated:

> The basic test is whether the directors can satisfy themselves that the information that is available provides a reasonable basis for judgment that the benefits of the economies of scale are in fact shared by the advisor with the Fund (e.g., by appropriately fixed "breakpoints" or, alternatively, by means of a fee structure which, whether or not containing break-points, in effect incorporates economies of scale by virtue of a relatively low starting point which in effect subsumes economies of scale throughout). This does not mean that the directors must impose on Price Associates ... a detailed cost accounting system that will show to the penny the amount of profit arising out of the operation of the Fund; but it does mean that it is not inappropriate for the directors to request such information about direct and indirect costs (and the related accounting assumptions) as would be necessary to enable them to make a business judgment about the range of profitability that can reasonably be expected to accrue to the advisor from the operation of the Fund.
> Exhibit AZ, at 10.

**26.** Friedman had previously sent the proposed Rule 12b–1 to the directors. In addition, the effect of this rule on fee deliberations had been discussed at the 1979 joint meeting of all directors.

**27.** The independent directors and their counsel realized that the PLPS was based upon the central concept of fully distributed costs, and therefore it could not be relied upon as accurate in the context of a service business. The directors understood that the Adviser had PLPS data generated for internal use only. It is also clear that had the Adviser not allocated to its Counsel Division significant portions of its overhead and administrative expenses, the mutual funds managed by the Adviser would have had a lower profitability figure.

On February 25, 1981, a meeting of the Board of Directors of the Prime Reserve Fund was held.[28] In connection with this meeting, the directors of the Fund were given an extensive Agenda Book containing detailed information about the Fixed Income Division, the proposed Investment Advisory Agreement, the allocation of expenses between the Fund and the Adviser, the non-advisory services provided by the Adviser, the expense ration of the Adviser, and a comparison of the performance and advisory fee charged to the fund and those of other funds in the industry and those managed by the Adviser.[29]

At the meeting, following a presentation by the Adviser of its fee proposal, the directors reviewed the materials given to them and a discussion of the 1981 Agreement ensued. The directors discussed the PLPS data, Fund expenses, the reasons for the differences between the fee paid by the Fund and other funds, the growing net asset level of the Fund, and the nature and extent of economies of scale due to this growth.

Near the end of the meeting, the independent directors decided to meet privately to confer with their counsel. After a discussion lasting approximately half an hour, the independent directors decided to make a counter proposal to the Adviser. The Adviser, after hearing the independent director's proposal, countered with another proposal that was lower than its original proposal. After further discussion by the full Board of Directors, this revised proposal was adopted by the Board on the condition that the term of the 1981 Investment Advisory Agreement would only be for one year. The fee schedule agreed to was .4% on net assets up to $1 billion, .35% on net assets up to $1.5 billion, .275% on net as-

sets up to $2 billion, and .25% on net assets over $2 billion.[30]

On March 6, 1981, the Prime Reserve Fund proxy statement with the new Investment Advisory Agreement was mailed to shareholders of the Fund. At the annual meeting of the shareholders, held April 14, 1981, the shareholders overwhelmingly approved the 1981 Investment Advisory Agreement.[31]

During 1981, Prime Reserve Fund continued to grow at a rapid pace. By December 31, 1981, the net asset level in the fund had reached over $3.1 billion.

## DISCUSSION

I. Claims for Excessive Fees under Section 36(b) of the ICA

A. The State of the Law

Section 36(b) of the Investment Company Act of 1940 provides that:

> the investment adviser ... shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.

15 U.S.C. § 80a–35(b).[32] The statute specifically states that in an action brought under this section, "plaintiff shall have the burden of proving a breach of fiduciary duty." *Id.*

The legislative history of the Act clearly indicates that it is not the role of the Court "to substitute its business judgment for that of the mutual fund's board of directors in the area of management fees."

---

**28.** By the date of this meeting, the net assets of the Fund had reached approximately $2 billion.

**29.** The available information indicated that the fee charged to the Fund by the Adviser was on the low end of fees charged by other advisers to similar money market funds.

**30.** This fee was competitive with that of other money market funds and was again on the low side of the money market fund industry.

**31.** The vote in favor was over 124 million shares or 98.8% of all shares voted. The 1981 Agreement went into effect on May 1, 1981.

**32.** Section 36(b) was added to the Act in 1970. It was enacted to curb abuses that Congress perceived with respect to equity load funds during the 1960's. *See generally* S.Rep. No. 184, 91st Cong., 1st Sess., *reprinted in* 1970 U.S.Code Cong. & Ad.News 4897 [hereinafter "Senate Report"].

S.Rep. No. 184, 91st Cong., 1st Sess., *reprinted in* 1970 U.S.Code Cong. & Ad. News 4902 [hereinafter "Senate Report"]. Rather, the Court is charged with determining whether the adviser has "committed a breach of fiduciary duty in determining or receiving the fee." *Id.* The Senate Report also indicates that the investment adviser is entitled to make a profit and that the bill neither requires a "cost-plus" advisory agreement nor general concepts of rate regulation, such as those applicable to public utilities. *Id.* On the other hand, the Report also notes that a "corporate waste" standard would be "unduly restrictive" in light of the absence of the usual arms-length bargaining between the adviser and the fund.[33] *Id.* at 4901.

The primary authority in this Circuit for the interpretation of section 36(b) is *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2d Cir.1982). As set forth by the court in *Gartenberg,* the test is "essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances." *Id.* at 928. In other words, to be guilty of a section 36(b) violation, "the adviser-manager must charge a fee that is so disproportionately large that

it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Id.*

As noted by the court in *Gartenberg,* the legislative history of section 36(b) clearly establishes that Congress

intended that the court look at all the facts in connection with the determination and receipt of such compensation, including all services rendered to the fund or its shareholders and all compensation and payments received, in order to reach a decision as to whether the adviser has properly acted as a fiduciary in relation to such compensation.

*Id.* at 930 (quoting Senate Report, at 4910).

While all pertinent facts must be weighed in the determination of whether a fee is so excessive as to constitute a breach of fiduciary duty, the Second Circuit listed a number of factors that it considered to be of particular importance. These factors include: 1. the nature and quality of the service provided; 2. the adviser's cost in providing the service; 3. the extent to which the adviser realizes economies of scale as the fund grows larger[34]; 4. the expertise of the independent trustees of a fund, whether they are fully informed

---

**33.** In drafting section 36(b), the Senate was cognizant of the fact that the typical arm's-length bargaining between strangers does not occur between funds and their advisers. As stated in the Report of the Senate Committee on Banking and Currency:

Because of the unique structure of this industry the relationship between mutual funds and their investment adviser is not the same as that usually existing between buyers and sellers or in conventional corporate relationships. Since a typical fund is organized by its investment adviser which provides it with almost all management services and because its shares are bought by investors who rely on that service, a mutual fund cannot, as a practical matter, sever its relationship with the adviser. Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy.

Senate Report, *supra,* at 4901.

**34.** Due to the largely unseverable relationship between the adviser and the fund, the price charged by other similar advisers to funds managed by them is not the principal factor to be considered in evaluating a fee's fairness. As noted by the Second Circuit in *Gartenberg v.*

*Merrill Lynch Asset Management, Inc.,* 694 F.2d 923, 929 (2d Cir.1982):

Competition between money market funds for shareholder business does not support an inference that competition must therefore also exist between adviser-managers for fund business. The former may be vigorous even though the latter is virtually non-existent. Each is governed by different forces. Reliance on prevailing industry advisory fees will not satisfy § 36(b).

The reason suggested by the Second Circuit as to why fund competition for shareholder business does not lead to similar competition between advisers for fund business is the relative insignificance of the adviser's fee to each shareholder. *Id.*

However, while the rates charged by others should not be the standard to test the fairness of the advisory fee, the rates charged by others is nonetheless significant with regard to economies of scale:

We do not suggest that rates charged by other adviser-managers to other similar funds are not a factor to be taken into account. Indeed, to the extent that other managers have tended "to reduce their effective charges as the fund grows in size," the Senate Com-

about all facts bearing on the adviser's fee, and the extent of care and conscientiousness with which they perform their duties[35]; and 5. the volume of orders that must be processed by the manager.[36]

## B. Application of the Legal Standards

Application of the foregoing standards to this case confirms that plaintiff has failed to meet her burden of proving that the fees charged by Price Associates were so excessive as to amount to a breach of fiduciary duty within the meaning of § 36(b). In reaching this conclusion, the Court has given little weight to the testimony of Professor Bicksler[37] and Mr. Silver,[38] in that their views regarding the excessiveness of the fees paid by the Fund were based on

mittee noted that such a reduction represents "the best industry practice [which] will provide a guide."
*Id.* (quoting Senate Report, at 4902).

**35.** As stated in the Senate Report,
Directors of the fund, including the independent directors, have an important role in the management fee area. A responsible determination regarding the management fee by the directors including a majority of disinterested directors is not to be ignored. While the ultimate responsibility for the decision in determining whether the fiduciary duty has been breached rests with the court, approval of the management fee by the directors and shareholder ratification is to be given such weight as the court deems appropriate in the circumstances of a particular case.
Senate Report, at 4903.
Commenting on the care and conscientiousness of independent directors, the Second Circuit cautioned that benevolent intent of the directors does not shield the fee from judicial scrutiny:
But even if the trustees of a fund endeavored to act in a responsible fashion, an adviser-manager's fee could be so disproportionately large as to amount to a breach of fiduciary duty in violation of § 36(b). Moreover, an intent to defraud need not be proved to establish a violation. Section 36(b)(1) ... expressly relieves the plaintiffs of the necessity of alleging or proving that any defendant engaged in personal misconduct.
*Gartenberg v. Merrill Lynch Asset Management, Inc., supra,* 694 F.2d at 930.

**36.** This factor does not apply in this case because Prime Reserve Fund is an independent fund, not a brokerage-operated fund. In the brokerage funds, the investor deals with his registered representative and is considered a customer of the brokerage house. In the independent funds, the investor deals primarily with a bank and tells the bank when to put money in and when to take money out. In this case, State Street Bank performed the order processing function for the Fund under a separate contract.

**37.** Professor Bicksler concluded that fees charged by Price Associates were outside the range of reasonableness derived from a competitive market. His conclusion was "essentially a judgment based on financial and economic reasoning, taking into account the relative skill required as well as the value contribution of managing a short term portfolio vis-a-vis other types of portfolios." Tr. at 226. Professor Bicksler, while performing what he termed a "standard economic analysis," did not consider all of the relevant factors that this Court must consider. Tr. at 243. He not only failed to consider the adviser's cost of providing the advisory services, Tr. at 252, but he also failed to investigate whether the independent directors in this case bargained with care and in good faith. Tr. at 243. Accordingly, Professor Bicksler's opinion that the fees in this case are excessive cannot be given much weight.

**38.** Mr. Silver also concluded that the fees paid by the Fund to the Adviser were excessive. In reaching his conclusion, Mr. Silver first found that the profitability percentage of the Fund exclusive of marketing was significantly higher than that of all the other product lines of the Adviser. Next, Mr. Silver found that both the equity and fixed income fee rate structures for counsel clients were lower than the fee charged to the Fund. Considering these findings to be excessive fee indicators, Mr. Silver established approaches to test profitability, both internal and external to the Adviser, and comparative fee rate structures for equivalent services.

Evaluating Mr. Silver's analysis and conclusions, the Court finds they are fatally flawed in at least two respects. Initially, Mr. Silver did not consider all of the factors the Second Circuit found relevant in *Gartenberg.* He did not consider the nature of the services provided to the Fund, Tr. at 729, 767, or the economies of scale in the money market industry, Tr. at 774–75. In addition, Mr. Silver, did not study the actual behavior of the directors in their negotiation of the fee. Tr. at 776. Moreover, Mr. Silver attempted to compare the fees charged by the Adviser to the Fund to fees charged by the Adviser to its private counsel accounts and fees charged by others for performing different types of services. In making his comparison, however, Mr. Silver neglected to inquire about the services provided to counsel clients, Tr. at 770, and was therefore unable to legitimately compare the fees charged to the Fund to the fees charged to counsel clients. The evidence before this Court clearly indicates that if Mr. Silver had made such an inquiry, he would have found that the types of services provided by the Adviser to the Fund and private counsel clients

factors different from those the *Gartenberg* court emphasized. Similarly, the Court has given little weight to the testimony of Professor Baumol, finding his testimony regarding competition in the market for advisory services to be directly contradicted by the views of the Second Circuit in *Gartenberg*.[39] Having found the testimony of the experts presented by both sides to be unavailing, in that all of the experts failed to address the relevant legal as opposed to economic implications of this case, the Court itself now must apply the analysis required in this Circuit. Although the Court considered all relevant facts in connection with the determination and receipt of the fees, the Court accorded the greatest weight to the testimony and documentary evidence which shed light on factors stressed by the Second Circuit: the nature and quality of the services rendered, the cost of these services, the sharing of economies of scale as the Fund increased in size, and the qualifications and performance of the independent directors.

### 1. Nature and Quality of Services

With regard to the nature of the services performed by the Adviser, the Court found the testimony of Mr. Taber, the president of the Fund and assistant director of the Adviser's Fixed Income Division, to be very credible. As explained by Mr. Taber, the nature of Price Associate's services for Prime Reserve Fund during the time at issue in the litigation fell basically into two categories: investment services and noninvestment advisory services. Investment services consist of four basic types of activity: research, portfolio management, trading, and administration and control. Research services are broken down into eco-

---

differ substantially. *See* Tr. at 952–954. Finally, Mr. Silver's analysis is flawed in that he compares the Adviser's rates and profitability (excluding marketing expenses) to rates and profitability of companies that perform services that are unrelated to the advisory services at issue in this case, such as insurance companies, large banks and trust companies. *See e.g.,* Tr. at 699, 786. *See also, Gartenberg v. Merrill Lynch Asset Management, Inc., supra,* 694 F.2d at 930 n. 3 (fee rates of advisers to non-mutual fund clients should not be used as criterion for determining fairness of mutual fund fees because advisers to other types of entities perform services that do not involve a myriad of daily purchases and redemptions). Notably, Mr. Silver also errs in that he does not exclude marketing from any of the other categories of business with which he purports to compare the Adviser. *See* Tr. at 785. For the foregoing reasons, the Court gives minimal weight to Mr. Silver's conclusion that the fees charged by the Adviser to the Fund are excessive.

**39.** Professor Baumol concluded that the fees charged by the Adviser to the Fund were not excessive. In reaching this conclusion, the Professor utilized three tests: 1. an examination of the degree of competitiveness of the advisory service activity; 2. a direct test of profitability; and 3. a comparison of fees charged by the Adviser with fees charged under competitive circumstances for similar services. With respect to his first test, Professor Baumol found that the market for advisers is characterized by a "very substantial degree of entry" and is sufficiently competitive to prevent excess profits. Specifically, Professor Baumol opined that "whatever firm is foolish enough to overcharge

is constantly leaving itself vulnerable to the threat of additional entry." Tr. at 293.

This Court takes issue with Professor Baumol's attempt to characterize the market for advisers as competitive. As the Second Circuit has observed:

> A fund cannot move easily from one adviser-manager to another. Therefore "investment advisers seldom, if ever, compete with each other for advisory contracts with mutual funds."

One reason why fund competition for shareholder business does not lead to competition between adviser-managers for fund business is the relative insignificance of the adviser's fee to each shareholder. The fund customer's share of the advisory fee is usually too small a factor to lead him to invest in one fund rather than in another or to monitor the adviser-manager's fees. *Gartenberg v. Merrill Lynch Asset Management, Inc., supra,* 694 F.2d at 929 (citations omitted). It was due to this very lack of competition that the Second Circuit held that factors other than comparative industry fees may be more important in determining whether a fee is so excessive as to constitute a breach of fiduciary duty. *Id.* at 930. Professor Baumol did not deal in a cohesive fashion with the factors suggested by the Second Circuit but rather, like Professor Bicksler and Mr. Silver, did an economic as opposed to a legal analysis. Because the Court rejects the foundation for Professor Baumol's argument, the existence of competition in the market for advisers, this Court must disagree with the professor's conclusion that such alleged competition results in fee schedules that are consistent with arm's-length bargaining, whether or not it occurs in fact.

nomic research and analysis, credit analysis, and relative value analysis.[40]

Monetary economic research and analysis involves looking at trends in the economy as a whole. Specifically it involves activities such as forecasting interest rates and expectations, studying monetary aggregates and Federal Reserve policy, analyzing fiscal policy and short-term credit demands, and monitoring the Euro-bond and Euro-currency markets.

Credit analysis consists of developing internal ratings for hundreds of corporations, as opposed to relying on outside credit rating services. The end product is an approved list of securities that the Fund purchases. Credit analysis also includes establishing direct contact between the credit analysts of the Adviser and the financial management of the world-wide organizations in which they invest. In addition, credit analysis also involves making comprehensive cash flow analyses, and developing ratios for liquidity, capitalization and profitability assessments.

Value analysis is the act of identifying opportunities for active repositioning along the yield curve. Specifically, it involves swapping, repositioning and insuring that investors get the best yield for their money. Value analysis also encompasses monitoring yield differentials among different sectors and also as between and among different securities within a sector. Finally, it includes employing the original credit analysis to identify securities that are overvalued and undervalued and acting accordingly. Value analysis involves a significant amount of computer and data processing time.

Portfolio management, which is handled by the Investment Advisory Committee at their weekly meetings, was described by Taber as the "bringing together of the findings of our research in the economic, credit and value areas, so that we could create a proper portfolio structure we felt appropriate for the environment and within the terms and restrictions of the prospectus." Trial Transcript ("Tr.") at 866. Taber indicated that he devoted a significant amount of time to this difficult function. Tr. at 1009.

Trading is closely related to Portfolio management. Once a portfolio structure is selected, the adviser buys, sells, and swaps individual securities to create that structure. Price Associates also performs this back office trading activity for the Prime Reserve Fund. This activity consists of making the trade and following through on whether the trade settled, whether there was a fail, and whether there was back value that had to be corrected. In making a trade, the trader needs to be aware of guidelines set by the Investment Advisory Committee as well as intersecting regulatory limitations and restrictions. The Adviser has the resources available to coordinate all aspects of this complex trading function.

Administration and control is a service that occurs alongside the trading activity. The individuals in the Fixed Income Division involved in this activity control, reconcile and administer the paperwork created by the trading transactions.

Noninvestment advisory services provided by the Adviser fall into four categories: shareholder services; fund accounting; meeting legal and regulatory requirements; and marketing.

Shareholder services provided by Price Associates fall into two categories: services to existing shareholders and services to prospective investors. The Adviser is responsible for fielding questions on performance, taxes, retirement plans, yield and dividends, fielding complaints about the transfer agent, fielding requests for literature, confirming monthly dividends for quarterly statements and policing enforcement of the Fund's thirty day policy on withdrawals of funds.[41] The evidence indicates that Price

---

**40.** The Adviser provides all personnel to the fund for the provision of services pursuant to the Investment Advisory Agreement. There is no separate fund employment staff. In actuality, the fund is merely a shell. In accordance with the Investment Advisory Agreement, there is no additional charge for any of the services provided.

**41.** If a shareholder invests by check, the Fund has a 30–day waiting period until a redemption can be made out of the fund. The purpose of

Associates handled 360,000 inquiries in 1980 and 760,000 inquiries in 1981 relating solely to the Prime Reserve Fund.[42] Although there is no evidence as to how many of these calls were answered by an answering machine, it is clear that many Adviser employees were required to deal with these phone calls.[43] Taber testified that it took between thirty and forty employees to perform this function in 1980 and well over sixty in 1981.

Fund accounting is the actual establishment of a daily net asset value and yield. As an open-ended mutual fund, Prime Reserve Fund has to have a net asset value determined each day. The Adviser's fund accounting group in Baltimore prices each Fund issue with a maturity over sixty days and comes up with an overall net asset value per share.

The Adviser also is responsible for meeting a myriad of legal and regulatory requirements. These requirements included registering the fund with the Securities and Exchange Commission and preparing the necessary filings to be registered in all fifty states.

Marketing services involve the formulation and implementation of an advertising strategy as well as the handling of resulting inquiries from prospective shareholders. Both the Adviser and Directors believe that significant marketing efforts are

crucial to the success of the fund.[44] During the time at issue in this litigation, the inquiries about the Fund increased as the Fund grew in size.

Not only did the Adviser perform this wide range of services for the Fund, but it also performed them well. The undisputed evidence in the record establishes that Prime Reserve Fund was one of the best performers with respect to yield in the money market industry. The Lipper annual rankings rated Prime Reserve Fund eight of forty funds in 1978, ten of fifty-three funds in 1979, and eight of sixty-seven funds in 1980. Lipper three-year trailing rankings rate the fund three of forty-one funds from 1978–80, six of fifty funds from 1979–81, and nine of sixty-six funds from 1980–82.[45] The Fund also had a well above average performance in the Donoghue rankings. Prime Reserve Fund was ranked fourteen of forty-four funds in 1978, nineteen of sixty-three funds in 1979, and six of sixty-four funds in 1980. In no ranking was Prime Reserve Fund ever below the top twenty percent in performance during the time at issue in this litigation. These statistics clearly speak for themselves with respect to the quality of service provided by the Adviser. Further indications of the Adviser's above average performance are the significant increase in the size of the Fund and the Fund's overall

this waiting period is to avoid kiting. When this policy causes hardship, the shareholder can request an exemption. The Adviser hears the request and makes the final decision on waiver of the policy.

**42.** In contrast, the evidence establishes that the State Street Bank only handled 250,000 calls in 1980 and 430,000 calls in 1981. Moreover, these calls were for all mutual funds in the Price complex of funds, not just the Prime Reserve Fund.

**43.** Plaintiff attempts to argue that State Street Bank, rather than the Adviser, performed shareholder services. Tr. at 133. This argument is not supported by the evidence. While it is certainly true that State Street Bank performed the functions of taking in new accounts, holding portfolio securities, and answering routine questions, the Adviser dealt with many shareholder concerns that the bank did not. Moreover, the Court finds plaintiff's attempt to use the 15% profitability margin of State Street Bank as a measuring stick of reasonable profit to be inap-

propriate in that the services performed by State Street Bank and the Adviser are simply not comparable.

**44.** Taber testified that the Adviser felt that it could manage the Fund more efficiently if it were larger and, therefore, the Adviser believed it was beneficial to market the Fund. Taber explained that a broker or dealer is more prone to offer the Fund a larger as opposed to a smaller block of commercial paper or other securities. Thus, a bigger fund, which could afford bigger blocks of securities, would have better opportunities in the market.

**45.** Prime Reserve Fund also performed well in the Lipper five-year trailing rankings. The Fund ranked five of twenty-four funds from 1976–80, two of thirty-four funds from 1977–81, four of forty funds from 1978–82, five of forty-nine funds from 1979–83, and eight of sixty-six funds from 1980–84.

gain in market share of assets going into retail taxable money market funds. As independent director Horn correctly observed, "the performance of Price Associates ... was among the best in the business." Tr. at 1112.

### 2. Cost of Providing Service

By far the most difficult factor to analyze in this case is the Adviser's cost of providing advisory services to the Fund. Of the two primary methods of calculating cost and profitability, the full-cost method and the incremental-cost method, the Court finds neither method completely satisfactory. However, while the Court will consider the results of both methods in its determination of whether the fees charged by the Adviser were excessive under section 36(b) of the ICA, it will give greater weight to the results of the full-cost method, which the Court feels presents a more accurate picture of the actual costs incurred by the Adviser.

The incremental-cost method attempts to calculate the addition to a firm's total cost that results from its provision of a particular product or service. In other words, it is the difference between the total cost when a product or service is provided at a certain level and the total cost the firm would incur if it ceased to provide that product or service. Although no incremental cost study was available at the time the directors in this case approved the 1980 and 1981 Agreements, such a study was prepared by the defendants during preparation for this trial. This incremental-cost study indicated that during 1980, the incremental costs of managing the Fund were $200,000 while the fees received by the Adviser totaled $4,331,360. For 1981, the incremental costs were calculated at $868,000 while the fees received rose to $8,362,250. Plain-

tiff asserts that this study indicates that the Adviser had a ninety to ninety-five percent profit margin in servicing the Fund.

■ Although the difference between the fees earned and the incremental costs appears significant on its face, the Court feels that these figures vastly underestimate the actual cost to the Adviser of servicing the Fund. Because incremental costs are those costs which are specifically and one hundred percent dedicated to providing a particular service, incremental-cost accounting does not take into account the common costs that are incurred on behalf of more than one service. These common costs, however, are quite tangible and must be taken into account. Hence, in a multiproduct business, such as that run by Price Associates, where many, if not most, costs are common costs, the Court finds an incremental-cost test is not a particularly reliable way to assess the real costs of supplying one product.[46]

The full-cost method of calculating costs takes the entire cost of running an operation and attempts to allocate it in some rational way among all of the services or products of that operation. As previously discussed, the Adviser changed its method of allocating costs during the time at issue in this litigation. The old full-cost accounting system produced data indicating that the Adviser earned a pre-tax profit margin of approximately fifty-eight percent during the first nine months of 1979 and sixty-four percent during the last three months of that year. As calculated under the new full-cost PLPS, the Advisor had a pre-tax profit margin of 66.8% on the Prime Reserve Fund in 1980.

The problem with relying on full-cost accounting data is that the results received

---

**46.** Independent director Horn testified at trial that she would not value incremental data highly. Explaining, she stated:

> Incremental cost data would be costs that were solely associated with the particular product you were looking at, and in a complex service business like the mutual fund business a great many of the important resources are shared resources.
>
> So it is essential in a management information system, which I consider these cost ac-

counting systems to be, to make them relevant to the information management, or in this case directors, needed, that there would be some attempt at understanding how some of the major resources of the firm were used in supporting the product, and the incremental cost data would not provide me with that. Tr. at 1096–97. Horn indicated that she would give some value to fully distributed cost data. Tr. at 1097.

largely depend on the assumptions underlying the allocation system.[47] There are many acceptable ways to allocate common costs, each of which leads to significantly different results.[48] Even plaintiff's economic expert Professor Bicksler observed that full-cost accounting does not give an objectively accurate picture of the profitability of one product line in a multiproduct firm. Tr. at 245. This Court agrees and in so doing acknowledges that it is left in this case with the problem of uncertain profitability.

Notwithstanding the virtually impossible task of calculating Price Associate's exact cost of servicing Prime Reserve Fund, the Court has examined the assumptions underlying the Adviser's PLPS and has found them basically reasonable.[49] Having no better alternative, the Court is prepared to accept the PLPS 66.8% profit margin figure

**47.** *See supra* notes 15–17, 27 and accompanying text. Independent director Horn commented on this method of allocating costs.

> Well, the cost information I would find most valuable would be a fully distributed system but I find it of limited value because distributing the costs is an art and not a science in all of our service businesses, and for that matter in manufacturing these days it is getting to be more and more so.
>
> And so while I want to see it, nonetheless I have to view it in the context of its limitations and based on my knowledge that there are an enormous number of assumptions that must go into creating such a system.

Tr. at 1099. Commenting specifically on the PLPS data, Horn stated that "it was reliable enough to be interesting but not reliable enough to be used in a scientific way." Tr. at 1132.

**48.** Professor Baumol, for example, conducted four experimental allocations of common cost. He allocated such costs on the basis of revenues, direct labor hours, direct labor dollars, and number of accounts. Utilizing direct labor dollars, the return on capital was calculated at two hundred and forty-seven percent. Allocating common costs by direct labor hours, the rate of return was ninety-three percent, while allocating common costs by revenues produced an eighty-one percent rate of return. However, when common costs were allocated on the basis of accounts, data indicated that the Adviser incurred a 124.9 percent loss on the Fund. This does not indicate that any particular allocation is correct, but rather, that all full-cost accounting systems are subject to significant variation in results depending on how the individual creating the system chooses to allocate common costs.

**49.** The PLPS was developed under a full-cost concept that captures all costs that are directly associated with each product as well as an equitable share of indirect and corporate administrative expense. PLPS was reviewed by Price Waterhouse & Co. to assure that the major assumptions were adhered to and the mechanics of the revenue and expense allocations were sound.

Describing the PLPS in a February 12, 1981 memorandum to the Directors, the Adviser explained:

> Simply stated, the PLPS is designed to distribute to [the Adviser's] products, the salaries and other operating expenses already captured in [the Adviser's] financial accounting records. It transfers such costs and expenses from their natural expense and divisional classifications to defined functional categories and a corporate administrative category for subsequent distribution to [the Adviser's] products. The defined functional categories consist of research, portfolio management, operational support and sales promotion, which in essence represent activities that can be directly associated with the revenues generated by each of [the Adviser's] products. The corporate administrative category is comprised of expenses which only indirectly support the products. Upon distribution to these categories, the PLPS distributes the costs to [the Adviser's] defined products. Costs classified as functional and therefore identifiable directly with one or more products are distributed directly to such products. Corporate administrative costs are allocated to products on the basis of the relative number of employee hours charged to each product through the functional categories.
>
> Labor costs represent almost 70% of [the Adviser's] operating expenses. Accordingly, the overall reasonableness and utility of the financial information resulting from the operation of the PLPS, is dependent on the reasonableness and inherent precision of the mechanism used to assign labor costs to functions and products. [The Adviser] has developed a mechanism known as the "time matrix," which is used in the PLPS to identify and accumulate time spent by its employees in various functional activities in support of its seven products. The time matrix serves as a substitute for the detailed time card or time sheet systems under which employees are required to track on an hourly or daily basis the activities to which they devote their time.

While the PLPS is certainly not the only possible way to calculate costs, it appears to the Court to be one reasonable way of obtaining an approximate figure. In that no superior method was presented to the Court, the Court finds that the PLPS figures, although not totally accurate, may be relied on for the purposes of this litigation.

for 1980. With respect to the profit margins in 1979 and 1981, the Court is willing for the purpose of argument to accept the profitability figures calculated by plaintiff's expert Mr. Silver, a 59.1% profit margin in 1979 and a 77.3% profit margin in 1981. Tr. at 715–16, 1226. Applying the stipulated tax rate of approximately fifty percent, the Court calculates the profitability margin of the Adviser as being close to 29.5% in 1979, 33.4% in 1980, and 38.6% in 1981.

### 3. Economies of Scale

Another factor in assessing the fairness of the Advisory Agreement is whether Price Associates has taken account of any economies of scale in the management of Prime Reserve Fund in setting the advisory fee. As previously noted, with respect to this factor, it is appropriate to consider fee schedules in the money market industry.[50]

An analysis of the advisory fee schedule of Price Associates clearly indicates that the Adviser has taken economies of scale into account in setting the Prime Reserve Fund fee. From the outset and during the entire time at issue in this litigation, the Adviser has had one of the very lowest fee schedules in the industry. In 1979, the Adviser's fee level was set at .4%. As indicated in a January 1980 memorandum from Colhoun to the directors of the Fund, forty-nine of sixty-eight money market funds, approximately seventy-two percent, began their advisory fee at .5%. These funds had to introduce fee breaks at higher asset levels just to get their fees down to the Adviser's fee. During 1979, at an asset level of one billion dollars, the Fund's fee level of .4% was below all but six of the twenty-two largest funds that had assets of over $250 million.

As the Fund grew, the Adviser became increasingly concerned with economies of scale and keeping its fees at a reasonable level. In Calhoun's January 4, 1980 memorandum to the Executive Committee of Price Associates recommending a fee break to .35% at $1 billion, he informed the committee that while the Fund's management fee was not currently out of line with its competition it would become less competitive if the Fund continued to grow. Following the Executive Committee's approval of his recommendation, Calhoun sent a memorandum to the directors of the Fund seeking their approval and explaining the reason for the fee break.[51] The memorandum explained that "[i]t has been a historic practice of the Adviser to recommend fee breaks in Fund Advisory Agreements as the Funds become larger in size. The purpose of the fee break is to share the economies of scale with the shareholders." Throughout the entire period, the directors had been informed by their counsel Friedman about the concept of economies of scale. Tr. at 519. Director Deering testified that the fee break proposal was evaluated by the directors in terms of whether there was adequate sharing of economies of scale. Tr. at 1137. The Board of Directors subsequently approved the fee break proposal. In January 1981, the Adviser proposed an additional fee break.[52] Because the directors were concerned that the Fund might grow even larger and wished to ensure an adequate sharing of economies of scale if that occurred, the directors presented a proposal that extended fee breaks up to and including an asset level of $2.5 billion. Although the fee

---

**50.** *See supra* note 34.

**51.** Evidence indicates that this fee break was proposed prior to the filing of the lawsuit. Calhoun's memorandum to the Executive Committee, however, indicated an awareness of such suits in that it discussed the suits for excessive fees that had been filed against another adviser, Fidelity Daily Income.

**52.** Similar to his 1980 memorandum, Calhoun's January 13, 1981 memorandum stressed the Adviser's historical practice of taking economies of scale into consideration when setting fees: "T.

Rowe Price Associates has had a historical policy of introducing fee breaks as individual funds have grown. The purpose of introducing fee breaks has been to share the economies of scale with shareholders of the fund." At a $2 billion asset level, the Adviser's proposed fee break would have given the Fund an effective fee rate lower than 14 of the 16 retail funds and lower than 2 of the 6 institutional funds. The effective fee rate is the rate that applies over all of the assets of the fund after taking into account the industry break points.

break ultimately negotiated differed somewhat from the director's counterproposal, Director Horn testified that the breakpoints which had been agreed to involved a sharing of economies of scale. Tr. at 1112.

Evidence presented to the Court indicated that had the Adviser not instituted break-points, but rather maintained its .4% fee structure for 1980 and 1981, Price Associates would have earned an additional $2,375,000 at the $3 billion asset level. Thus, the Court finds that the Adviser's realization of economies of scale and its corresponding institution of break-points resulted in substantial savings to the Fund.[53]

4. Role of the Independent Directors

As pointed out by the Second Circuit, the expertise of the independent trustees of a fund, whether they are fully informed about all facts bearing on the adviser-manager's service and fee, and the extent of care and conscientiousness with which they perform their duties are important factors to be considered in deciding whether they and the adviser-manager are guilty of a breach of fiduciary duty in violation of § 36(b).

*Gartenberg v. Merrill Lynch Asset Management, Inc., supra,* 694 F.2d at 930. Evaluating the background, knowledge, and behavior of the independent directors, the Court finds: 1. that the directors are an exceptionally well-qualified group of individuals; 2. that they were kept fully informed about the factors necessary to set the Adviser's fee; and 3. that the directors were extremely conscientious with respect to their responsibilities and their role in approving the fee schedule.

a. *Expertise*

There is no question that the four independent directors of Prime Reserve Fund are well-educated and well-regarded members of the financial community. Throughout their careers, the directors have belonged to numerous professional societies and have received a number of professional honors and awards.

Director Horn received a B.A. from Pomona College in 1965 and a Ph.D. in economics from Johns Hopkins. She taught at John Hopkins while she was getting her degree and subsequently, taught part-time at Simmons College, Williams College and the Wharton School of the University of Pennsylvania. Horn was the first female president of the Federal Reserve Bank of Cleveland; indeed the first female president ever of a Federal Reserve Bank.

Director Deering received a B.A. from Drexel University in 1969. He was valedictorian of his class. Subsequently, he received an M.B.A. from the Wharton School of the University of Pennsylvania and engaged in graduate study at the University of Exeter in Devon, England. Deering is the senior vice-president and chief financial officer of the Rouse Company, a large publicly owned real estate development and investment company.

Director Vos received a Bachelor's degree in international affairs from the University of Paris in France. He received a Masters degree in public and international affairs from Princeton University. Vos also pursued some graduate study at the graduate school of business at Northwestern University. Vos is an international businessman with an extensive career in international business in South America, Australia, New Zealand, England, and the

---

**53.** It is interesting to note that for a $3 billion fund, Prime Reserve's fee is $1,125,000 less than the Merrill Lynch fee that was approved by the Second Circuit in *Gartenberg.* While plaintiff is correct in her contention that the effective fee rate of the Merrill Lynch fee is lower than the effective fee rate of Price Associates, the Court feels that the appropriate analysis is a comparison at equivalent size levels. Plaintiff's argument that the Adviser did not share economies of scale in a fair and reasonable way is also unpersuasive. Initially, the Court observes that

the Agreements were signed during times of unprecedented growth for the Fund. This meant that when the Adviser established a fee schedule, there was no way of knowing whether this amazing growth trend would continue. In addition, the Fund was growing primarily by the addition of many small accounts rather than a few large accounts. In this situation, the economies of scale are much less since each account requires some degree of individual servicing and record keeping. *See* Tr. at 363–64.

United States. He has held high level positions with a number of companies including Smith, Klein, Inc., Commercial Credit Company, and Norton Simon, Inc.

Director Linaweaver received a B.S. degree in engineering in 1955 and a Ph.D. in sanitary engineering and water resources in 1965 from Johns Hopkins University. Linaweaver has served on the faculty of Johns Hopkins. He also served as a White House fellow and assistant to the Secretary of the Interior under President Johnson. Linaweaver worked for over six years as the director of public works for the City of Baltimore and more recently has been in the practice of consulting engineering.

b. *Information*

The evidence is undisputed that the Adviser made every effort to keep the independent directors fully informed about the nature of their responsibilities as directors and the factors affecting the approval of a fee schedule.

All of the directors testified that Price Associates supplied them with an abundance of information about the Fund on a regular basis. In addition, it is clear that the Adviser never declined to give the directors any information that they requested when they were deliberating on the investment advisory contracts.[54]

According to independent director Horn, the Adviser provided the directors at any point with whatever information they needed: "We were always provided—in any situation that I know where a request was made for information it was always provided, regardless of how sensitive or confidential to the Associates the information might have been. They were always forthcoming with whatever information we asked for." Tr. at 1085.[55] Commenting on the Adviser's behavior with respect to furnishing information, Friedman opined that "Price Associates was a model in the furnishing of information. They not only gave the directors what the directors asked but they attempted to keep the directors currently apprised on developments in the industry and developments and practices within the organization." Tr. at 586. Friedman also explained that the Adviser invited the directors to major conferences on issues affecting the mutual fund industry and arranged a number of field trips, including one to the transfer agent State Street Bank. Tr. at 587.

The record indicates that the independent directors of Prime Reserve Fund had access to a wide variety of information and informational resources. While the Court finds it unnecessary to recite in detail each and every document the directors received, the Court will now briefly review the more

---

54. It was clear from the deposition of independent director Vos that he believed he was adequately informed.

> Q. In your work as a director of Prime Reserve Fund, specifically with reference to your approval of the advisory contract and the advisory fee, have you ever asked for information of Price Associates which Price Associates has declined or refused to give you?
>
> A. That has never happened. In fact, sometimes I think they give me too much information.

Deposition of Vos, dated May 29, 1981, at 110. Similarly, independent director Linaweaver was satisfied with the information he received from the Adviser.

> Q. Did you feel that you were fully informed as to the pertinent facts such as to enable you to comfortably make an intelligent and honest business judgment when you approved the investment advisory contract in February 1981?

> A. Yes.

Deposition of Linaweaver, dated June 18, 1981, at 109–10.

Independent Director Deering also stated that he and all of the other independent directors received all information that they requested. *See* Deposition of Deering, dated April 13, 1981, at 109; Tr. at 1144.

Moreover, Friedman testified that there was no occasion where the directors requested information and it was not provided. Tr. at 585.

55. Horn also stated: "If I felt the management of a firm that I was a director of was incomplete, inaccurate or unwilling to provide information, I would not be willing to continue as a director of that organization." Tr. at 1085. In Horn's view, the information provided by the Adviser to the directors was "accurate and complete." Tr. at 1085.

significant information that they had available.

The directors testified that each year before the negotiations for the advisory agreement began, they were sent a "volume of information" in agenda books. Tr. at 1141. Another important resource was Stanley Friedman, the directors' separate and independent legal counsel. Friedman spoke to the outside directors at least every other week and kept them fully informed about all relevant legal documents, including the effect of Rule 12b–1. In addition, each year at the annual contract renewal meeting, Collins, Taber and Calhoun made presentations to the directors about the nature and quality of the services performed by the Adviser, emphasizing the functions of the Fixed Income Division and the Investment Advisory Committee.

Included every year in the information made available to the directors were figures on the overall profitability and expense ratio of the Adviser. According to director Horn, the directors commonly requested and received additional information regarding projected expenses of the Fund at various levels, asset levels, and recommendations regarding fee breaks at various levels. Tr. at 1061.[56] Commencing in 1980, the profitability of the Adviser on a product-line basis was also made known to the directors upon request. To avoid misleading the directors, the Adviser carefully explained the reservations it had regarding the reliability of the data produced by the old cost accounting system. Tr. at 1272. The PLPS results for 1980 were provided to the directors in February 1981 along with a letter from Price Waterhouse verifying the results based on the given assumptions.[57] This data was supplied initially without marketing statistics and later, upon the request of the directors, with such statistics included.

Plaintiff argues that the information given to the directors was both incomplete and misleading. Initially, plaintiff contends that neither Friedman nor the directors was made aware until 1980 that the Adviser maintained product-line profitability reports that were internally generated on a quarterly basis. Moreover, when these reports were finally given to the directors in 1980, they were only provided with profitability data for the first nine months of 1979. Plaintiff argues that the reason the directors did not get to see the data is because the last three months of 1979 were the most profitable months and the Adviser wanted to hide this fact from the directors. Plaintiff also asserts that the directors were never provided with incremental-cost studies (which the Adviser did not have prepared until preparation for trial), relevant fee schedules from the competitive market or an available study commissioned by the Adviser comparing the fees of the counsel division and the mutual fund division. Finally, plaintiff maintains that in approving the 1980 advisory fee, the directors were mislead in a subtle manner because the Adviser presented them with profitability information that included information about the Adviser's marketing expenses.[58]

**56.** Deering also described the information requested and received by the independent directors:

We asked for information that I don't think associates had ever provided to the outside directors of their funds, having to do with profitability of the funds and compensation of the officers and key managers, and a lot more information on competitive alignment of other mutual funds of comparable size, comparable type, beyond just the investor advisory agreement, getting specific information on the expense ratios, giving information on performance, getting a lot of information on quality criteria that you could judge competitive funds.... So there was a lot of information that we requested and we always got what we asked for and relied on that in making our judgments.

．　　．　　．　　．　　．

They always gave us the best information they could provide.
Tr. at 1043–45.

**57.** The directors also requested an independent accounting firm to be present at one of their meetings to explain the PLPS.

**58.** In particular, plaintiff objects to the memorandum written by Calhoun which attempts to quantify the Adviser's entrepreneurial risk. In that memorandum, Calhoun informs the directors that since the inception of the Fund, the Adviser had incurred $1.2 million in marketing

The Court finds that the independent directors were neither inadequately informed nor mislead. With respect to product line profitability for 1979, the undisputed evidence is that Friedman only learned that product line profitability studies were available in 1980. He testified that prior to that time he did not think that section 36(b) required the directors to consider the profits of the adviser.[59] Friedman's memorandum to the directors reflected his belief that the law was uncertain in that he stated it was "not inappropriate" for the directors to request profitability information. Once this information was requested by the independent directors, the Adviser immediately supplied them with all of the known profitability data it had available. The Adviser could not provide them with the data for the last three months of 1979 in February 1980 because the company's books were not yet closed out so the figures had not yet been calculated. Tr. at 1271. There is no evidence that the Adviser was deliberately trying to hide information. When this data finally became available, the directors did not ask for it. According to Taber, this data was not supplied because it was derived from an inaccurate system and the Adviser was in the process of converting to the new cost accounting system. During this time, Taber stated that the Adviser was devoting all of its work and energy to obtaining 1980 product-line profitability results by February 1981. Tr. at

1005 The Court finds that the information generated by the old cost accounting system was not particularly reliable and there was no reason for the Adviser to supply the directors with the information generated concerning the last three months of 1979. Moreover, the directors never requested this information. The Court is confident that, had such data been requested, the Adviser would have given it to the directors.

The Court has similar views about the other studies the plaintiff feels the directors should have been given. As noted above, the directors were an extremely bright and articulate group of individuals. Had they felt that incremental cost studies would aid them in approving the fee, they surely would have asked the Adviser to do such studies. Apparently, these studies were neither asked for nor made.[60] As for the study comparing the fees of the counsel and mutual fund division, the Court has previously noted that the Adviser provides different services to its different divisions so such a study would not appear to be particularly relevant or useful to the directors in setting fees.[61] Thus, since the directors already had ample information before them, there was no reason to show the directors another study. Moreover, due to the unique nature of the services provided by money market advisers and the industry, the Court finds there were no fee

costs and had suffered an overall loss of $700,000 pre-tax. Calhoun further informed the directors that including marketing expenses, the Adviser had lost at a minimum over $300,000 on the Fund in the first nine month of 1979. Plaintiff argued that because a very significant percentage of the expenses attributable to the fund were selling expenses, the cost data received in 1980 looked very different when selling expenses were included:

> That is not to say, your Honor, that they deceived the directors. They kind of lumped all the expenses together. Again, we are not talking about deception. We are talking about a course of conduct where in a much more subtle way the directors were influenced by information they were provided and by information they weren't provided. In this case the fact that they were provided with selling expenses and provided with the data and the calculations to show what the profit was after selling expenses, and what the cu-

> mulative losses and profits were including selling expenses, a subtle effort was made by the adviser to influence the director's decision, so that they wouldn't look simply at the cost of managing the fund.

Tr. at 54–55

**59.** Explaining, Friedman stated that he relied on the Senate report as a guide when he advised the independent directors. While he believed that cost data was "of interest," he did not think that it was "a primary element in the consideration of the fee." Tr. at 613. Rather, Friedman focused on the process of setting the fee and economies of scale.

**60.** The Court has already observed that, in a business where most of the costs are common costs, incremental cost studies are not very useful. *See supra* note 46 and accompanying text.

**61.** *See supra* note 38.

schedules from the competitive market that could have appropriately guided the directors.[62] Plaintiff also presented no evidence that providing fee schedules for other industries is either required by law or a general industry practice. Accordingly, the Court is unprepared to hold that this type of information must be provided to the directors for them to be fully informed.

With respect to plaintiff's claim that the directors were mislead in 1980 by being shown distribution expenses along with the 1979 profitability figures, the Court finds that, as financially astute individuals, the directors were unlikely to be confused concerning marketing. By January 1980, Friedman had already sent the directors copies of the proposed Rule 12b–1 and had discussed it individually with Vos and Deering.[63] In fact, even though Rule 12b–1 was not yet in effect at the time,[64] Calhoun explained to the directors when he provided them with the product-line profitability memorandum that profitability should first be determined without consideration of the sales and promotional expenses.[65] After having discussed the subject in greater detail with independent director Vos, Calhoun

reported in a February 13, 1980 memorandum that when Vos reviewed the profitability figures and found them acceptable, Vos took note of the Adviser's profit margin both with and without new business expenses. Horn testified that the directors had discussed the proposed rule and the director's role under it.[66] Inasmuch as the directors were provided with complete and accurate information concerning marketing in 1980 and were fully capable of understanding the information presented to them, the Court finds no evidence that the independent directors were mislead when they approved the 1980 Agreement.

### c. Care and Conscientiousness

It is undisputed that the independent directors took their responsibilities with great seriousness and accordingly, performed their duties as directors carefully and conscientiously.[67] The evidence indicates that the independent directors not only carefully analyzed and debated the information they were given, but also actively questioned the Adviser and requested additional information when they needed it.[68]

**62.** *See supra* note 38.

**63.** Friedman testified that he told Vos and Deering that the proposed 12b–1 prohibited money market funds from using their assets for distribution except pursuant to a plan that had to be approved by the shareholders. Because the Fund had no such plan, Friedman told Vos and Deering that the rule required directors to insure that there was no indirect use of fund assets to pay distribution expenses. Friedman further explained what this meant in terms of the director's evaluation of the adviser's profitability. Tr. at 519.

**64.** Rule 12b–1 did not come into effect until October 28, 1980. Thus, this rule does not apply to the 1979 or 1980 contract renewal. The rule, however, does apply with respect to the 1981 renewal process.

**65.** Calhoun went on to comment in the same memorandum that marketing expenses could be considered in terms of quantifying the entrepreneurial risks assumed by the Adviser. Elaborating, Friedman explained that the directors could consider the marketing expenses in terms of the historical relationship between the Fund and the Adviser, i.e., once the profit was within an acceptable range, the historical relationship

could properly determine the location on the range. Tr. at 548–49.

**66.** Horn indicated that she fully understood the proposed rule:

Q: What did you understand the role of the independent directors to be under that proposed rule?

THE WITNESS: That in order for fund assets to be used, either directly or indirectly, to pay distribution or marketing expenses there would have to be a plan that was adopted, and that in the absence of such a plan fund assets could not be used, directly or indirectly, to pay those expenses; that in fact the SEC did not intend that rule to keep the directors from considering anything that in their judgment was relevant but that the actual use of fund assets for these expenditures would depend on the existence of a plan. Tr. at 1051–52.

**67.** Even plaintiff concedes that the directors did not fail in integrity. Tr. at 26. Plaintiff's expert Professor Bicksler testified that the directors are serious people who took their duties and responsibilities as fiduciaries seriously. Tr. at 261.

**68.** In addition, the Court finds no evidence in the record that the directors were ever rushed or pressured to approve the advisory agree-

The minutes of the January 18, 1980 director's meeting indicate that the directors did not unquestioningly accept the Adviser's suggestions. Vos, for example, raised a number of questions with respect to the proposed fee break, including: 1. Is the advisory fee competitive?; 2. Are there economies of scale?; and 3. Is the profitability of the Adviser reasonable? At trial, Deering described the interchange between the directors and the Adviser that occurred during the 1980 renewal process:

So during the January meeting we had a number of discussion about [the Adviser's compensation system] and asked for information on profitability, discussed the fee break and what was also happening in the world of interest rates and the rest at that time, which was very volatile.

.   .   .   .   .

They then supplied us with some additional information on the funds and their profitability. [Vos] and I felt very concerned about understanding this completely, so he and I had dinner the night before the next board meeting with Stanley Friedman, who was the outside general counsel for the funds, to really discuss the profitability information, was it adequate, how should we consider the profitability information, how to analyze it, and could we make the judgment therefore that the fees were appropriate, competitive and, in our judgment, a fair deal for the shareholders. And then in the February meeting we actually went through all the materials in the profitability analysis and came to the conclusion that yes, we were comfortable with it but that the profitability material that had been presented was, as described by T.

Rowe Price Associates, inadequate for the complexity of the funds that were then [emerging] in the firm.

Tr. at 1038–39.[69]

At this point, the minutes of the February 27, 1980 board meeting reflect that the directors would approve the 1980 Agreement if the Adviser agreed to supply them with new profitability figures generated by a revised cost-accounting system, a system that would be reviewed by an independent accounting firm to confirm its reliability. After the Board of Directors of the Adviser met, it agreed to the independent director's request to provide such cost accounting data the following year. In the Court's view, the discussion and information requests that ensued during the contract renewal process clearly indicate that the directors were conscientious, well-informed, and assertive individuals, who looked at all the relevant facts prior to approving the 1980 Agreement.

Similarly, throughout the 1981 renewal process, the independent directors continued to request information and actively debate with the Adviser. At the January 21, 1981 Board of Directors meeting, the minutes reflect a discussion that occurred concerning the setting of an additional break-point. Because the directors did not yet have the profitability data from the PLPS at this time, the directors decided to postpone additional discussion until the following meeting. The directors requested that additional information be provided to them prior to that meeting, including: 1. profitability data; 2. projected expenses at various asset levels; 3. recommendations regarding fee breaks at various asset level; 4. Lipper data; 5. projected advertising

ments. *See e.g.* Deposition of Vos, dated May 29, 1981, at 110; Deposition of Linaweaver, dated June 18, 1981, at 110; Deposition of Deering, dated April 13, 1981, at 110. In fact, the evidence indicates the Adviser encouraged the directors to carefully evaluate the information given to them. *See* Tr. at 1266.

**69.** Deering's trial testimony indicated a great concern about getting a fair deal for the Fund:

We always reviewed the profitability of T. Rowe Price Associates, which although a private company at the time they always gave us

financial results for the firm at the time. So we knew the overall profitability of associates, we knew what their expenses of doing business were. We had even reviewed their compensation systems to make sure they were appropriate and they weren't taking profit out in the form of compensation to reduce the profitability.

.   .   .   .   .

We wanted to make sure that what was there was competitive, appropriate but not excessive.

Tr. at 1138.

budgets; and 6. an endorsement from Price Waterhouse & Co. as to the reliability of the profitability data produced by the PLPS. This data was provided to them prior to the February meeting.

The events of the February 25, 1981 meeting further indicate the seriousness with which the independent directors viewed their role in the fee negotiations. At this meeting, following the annual presentation on the Adviser's services, Price Associates proposed an additional fee break at a certain level. The minutes reflect that the independent directors did not simply approve the Adviser's suggestion, but rather had a private meeting with Friedman. Following this meeting, the independent directors expressed certain concerns about the original proposal and introduced an alternative fee schedule.[70] The Adviser discussed this proposal with the independent directors and suggested an alternative proposal.[71] After convening in another private session with Friedman, the independent directors agreed to the revised proposal.[72] This proposal was more favorable to the shareholders of the Fund as it had a lower fee schedule than the original proposal of the Adviser.

Certainly this series of events indicates that the directors were extremely able and conscientious. This is not a case where a contract was rubber-stamped by docile individuals; this is a case where competent, aggressive individuals analyzed the facts and actively bargained to obtain a better deal for the Fund.

**70.** This proposed fee schedule provided for a fee of .4% from $0 to $1 billion, .35% from $1 to $1.5 billion, .30% from $1.5 to $2 billion, .25% from $2 to $2.5 billion, and .20% for over $2.5 billion in net assets. Because of the potential changes in the size of the Fund, the directors suggested that a formal six month review be instituted. The directors later concluded that since they could terminate the Agreement upon 60 days notice, such a review was not needed.

**71.** This proposal was a fee of .4% at $0 to $1 billion, .35% at $1 to $1.5 billion, .275% at $1.5–$2 billion, and .25% at over $2 billion of net assets.

**72.** Describing this process, Deering testified as follows:

With respect to plaintiff's argument that the directors improperly allowed the 1981 advisory fee to include money to finance distribution expenses, the Court finds that plaintiff's contentions are completely lacking in merit. The record indicates that the directors were kept fully informed about the Rule 12b–1 and followed the advice of their counsel. The Court finds that Friedman took great care in explaining the effect of Rule 12b–1 to the directors. Friedman's February 11, 1981 memorandum specifically informed the directors that they must insure that the advisory fee does "not involve the use of Fund assets to finance distribution in violation of the rules of the Securities and Exchange Commission." Friedman goes on to explain the purpose of Rule 12b–1 and director's responsibilities under the rule in significant detail. The Court finds no evidence to indicate that these intelligent, highly qualified individuals either did not comprehend or deliberately disregarded the appropriate legal advice that they were given by their counsel.

In fact, the record indicates that the directors made every effort to keep Friedman's advice in mind as they deliberated. Linaweaver, for example, testified that when he deliberated on the 1981 Agreement, he had in mind the materials sent to him by Friedman and in particular the factors Friedman told him to consider. Deposition of Linaweaver, dated June 18, 1981, at 108. Independent director Horn testified extensively on this topic at trial:

There is the matter of marketing expenses. We did have data on marketing

We did consider [the original proposal by the Adviser]. We felt it wasn't enough given not just where the fund was but where the prospects were. We felt at the time the fund was very volatile, interest rates at that time were at very high levels and no one anticipated them staying there and at some point we anticipated a decline as well. But given the prior year we wanted to have something that would share those economies of scale with the shareholders prospectively if growth continued on the curve it had been on. So we devised a counterproposal to associates, invited them back in, presented it, we discusssed it with them in some detail. They then left and came back with another proposal which we then discussed in some detail and agreed to. Tr. at 1142.

expenses. There is the matter of Rule 12b–1. We had the data on the marketing expenses before us. As directors we felt we had to have it to make a sensible business decision about whether this fund was being run in the best interests of the shareholders. We had during the discussion of the advisory agreement informed ourselves on the issue of marketing and advertising expenditures. *We were advised by the fund's counsel that those were specifically not to be taken into account as we voted on the advisory agreement, and I for one abided by the counsel's advice.*

Tr. at 1084 (emphasis added).[73] Deering testified on the subject of distribution expenses as well: "In terms of making the judgment as to whether the fees were reasonable under the guidance of 12b–1, it would be before distribution, that was the guideline we had, along with alot [sic] of other criteria from our outside counsel to evaluate the fee." Tr. at 1164.

The Court takes issue with plaintiff's assertion that it was improper *per se* for the independent directors to have access to the distribution expenses when they approved the advisory fee. Under Rule 12b–1, the directors had an obligation to assure themselves that there was not an indirect use of fund assets for distribution expenses. In order to satisfy their obligations under this rule, the directors were not incorrect in requesting the firm's marketing data along with the profitability data to check that there was no use, direct or indirect, of fund assets for distribution.[74]

Moreover, the Court finds that it was not improper for the directors to view the data on distribution expenses to monitor the Adviser's performance, just as long as they did not consider these expenses when they voted on the advisory agreement. As pointed out by Horn, the directors were interested in looking at advertising and marketing expenses because "what Price Associates was doing with respect to promoting this fund had a real impact on the quality of the fund. In this business, it is very helpful to be larger rather than smaller in size." Tr. at 1065. Similarly, Deering explained that he was interested in how the Adviser was promoting the Fund because he thought it was in the best interest

---

**73.** Later in the trial, Horn described Friedman's advice and what she did with it:

> Q. What did [Friedman] tell you [about the use the directors could put marketing information to]?
>
> A. By February of 1981, Rule 12b–1 was in effect and he told us, both in written form before the meetings and in oral form during the meeting, what 12b–1 said. He said that specifically that Rule 12b–1 was not meant to keep the directors from having information before them in order to make a business judgment, but that when the actual vote on the fees and fee breaks came, on the advisory agreement came, that we must not perform a mental calculation or, in effect, have in our minds the marketing expenses as a way of assessing profitability or as a way of concluding what the appropriate fees were.
>
> THE COURT: Did you follow that direction when you considered the matter and voted?
>
> THE WITNESS: Yes, I did.

Tr. at 1116–17.

**74.** In the release accompanying 12b–1, the Securities and Exchange Commission explained the prohibition on the indirect use of fund assets for distribution:

> It is the Commission's view that, an indirect use of fund assets results if any allowance is made in the adviser's fee to provide money to finance distribution. Therefore, when an adviser finances distribution, fund directors, in discharging their responsibilities in connection with approval of the advisory contract, must satisfy themselves either that the management fee is not a conduit for the indirect use of the fund's assets for distribution or that the rule has been complied with. However, under the rule there is no indirect use of fund assets if an adviser makes distribution related payments out of its own resources. In determining whether there is an indirect use of fund assets, it is appropriate to relate a fund's payments pursuant to the advisory contract to the adviser's expenditures for distribution and to view such expenditures as having been made from the adviser's profits, if any, from the advisory contract. To the extent that such profits are "legitimate" or "not excessive," the adviser's distribution expenses are not an indirect use of fund assets.... Profits which are legitimate and not excessive are simply those which are derived from an advisory contract which does not result in a breach of fiduciary duty under section 36 of the Act.

SEC Docket, Volume 21, No. 5, November 11, 1980.

of the Fund to be of greater size and scale. Tr. at 1161–63.[75] Reviewing the testimony of the directors, the Court finds that, while the directors were interested in what the Adviser was doing to promote the Fund, there is no evidence that the directors ignored their attorney's advice and improperly gave the Adviser an excessive fee so that the Adviser could indirectly use Fund assets to promote the Fund.

■ Section 36(b) instructs the courts to give director and shareholder approval of advisory compensation arrangements "such consideration ... as is deemed appropriate under all the circumstances." 15 U.S.C. § 80a–35(b)(2) Inasmuch as the Court finds that the independent directors were qualified, fully informed, and extremely conscientious individuals, the directors' approval of the fee should be weighted heavily.[76]

## C. Summary

■ Having analyzed all of the facts in connection with the advisory fees paid by the Fund to the Associates from April 24, 1979 to February 25, 1981, the Court concludes that the plaintiff has failed to sustain her burden of proving that the fees at issue during these years were so excessive as to constitute a breach of fiduciary duty under section 36(b).

With respect to the nature of the services, the Court finds that the performance of such a wide range of beneficial activities for the Fund required a significant amount of time and talent. Clearly, the Adviser devoted both that time and that talent as its services were of above average quality and produced results that were among the best in the industry. In addition, these services were being performed at rates that were among the lowest in the industry and unquestionably reflected the Adviser taking economies of scale into consideration. Furthermore, the independent directors of the Fund who approved the fee schedules were not only exceptionally capable and well-informed, but also the type of

75. While Deering wanted the Fund to get bigger, he was also well aware of the legal requirement that the Adviser's fee must be reasonable before considering distribution expenses:

[W]e were walking a legal tightrope on whether the fees were excessive before distribution expense in order to abide by the SEC's rules on using fund assets for distribution, and that's the 12b–1 issue, which is very technical, and we were very aware of it because we had been advised by counsel.

By the same token, there was another business, a very practical element. [Vos] and I both felt and shared the opinion that they should be promoting this fund to get it big, and that there was going to be a lot of advantage to the shareholders in having size and scale in the market; and secondly, we wanted to see how they were doing with the enterprise of advising the Prime Reserve Fund that it was profitable to them, that they would be able to continue to devote the services and staff to it that had produced performance results in the past that we wanted to see in the future.

So we were looking at it in terms of—also you had to come down to after distribution, after everything to get to the net income that tied into the public, certified financials. So I think we were in the dilemma of trying to evaluate it for one reason without distribution and for another reason with distribution. And these were two ingredients, along with a lot of other ingredients, in evaluating whether the advisory agreement made sense, but it was very significant.

> .  .  .  .  .

[W]e were under strict guidance from fund counsel to evaluate the investment advisory fee agreement before distribution expenses in terms of getting any further; in other words, we had to evaluate it first ex-distribution to make a judgment that was reasonable.

Then we got into the practical issue of I want to see it after distribution as well because I have other concerns that have to be dealt with that tie into the accounting system and tie into the profitability of the undertaking for Associates. So I was never able to ignore it or—it was separate issues in my mind.

Tr. at 1161–63.

76. In weighing the approval by the independent directors, it is significant to note that "the structure and purpose of the [Act] indicate that Congress entrusted to the independent directors of investment companies ... the primary responsibility for looking after the interests of the funds' shareholders." *Burks v. Lasker*, 441 U.S. 471, 484–85, 99 S.Ct. 1831, 1840–41, 60 L.Ed.2d 404 (1979). With respect to the overwhelming approval of the Agreements by the shareholders of the Fund, the Court feels such approvals should be properly noted, but not given controlling weight in that the shareholders' behavior is usually strongly influenced by the actions of the independent directors.

people who treated their responsibility to the Fund with great seriousness. While it cannot be denied that the Adviser earned a significant profit from these services, it does not appear to the Court, in light of all of the facts, that the fees charged by the Adviser were so disproportionately large that they bore no reasonable relationship to the services rendered and could not have been the product of arms-length bargaining.[77]

## II. State Law Claims for Breach of Fiduciary Duty

■ In Count II, plaintiff alleges that the defendants breached their fiduciary duty under Maryland law to the Fund. Plaintiff argues that the appropriate legal standard to be applied is a duty of full disclosure as set forth in *Fogel v. Chestnutt*, 533 F.2d 731, 745 (2d Cir.1975), *cert. denied*, 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976) and *Galfand v. Chestnutt Corp.*, 545 F.2d 807, 811 (2d Cir.1976). Defendants disagree, asserting that the cases cited by plaintiff are federal cases and that the appropriate standard is waste and domination. Inasmuch as the Court has already held that the Adviser and interested directors kept the independent directors of the Fund fully informed[78] and

that there was neither waste[79] nor domination,[80] it is unnecessary for the Court to consider which of these standards is applicable.[81] Regardless of which standard is adopted, plaintiff's claims lack merit and must be dismissed.

## III. Proxy Violations

■ In Count III, plaintiff claims that the proxy statements distributed to Fund shareholders to solicit their approval for the 1981 Agreement violated section 20(a) of the ICA, 15 U.S.C. § 80a–20, and Rule 20a–1 promulgated thereunder, 17 C.F.R. § 270.20a–1, because the proxy statements did not include profitability information.[82]

Rule 20a–1 makes applicable to solicitations all rules and regulations promulgated by the Securities and Exchange Commission pursuant to section 14(a) of the Securities Exchange Act of 1934. 15 U.S.C. § 78n. Rule 14a–9 forbids solicitation by means of any proxy statement "which omits to state any material fact necessary to make the statements therein not false or misleading ..." 17 C.F.R. § 240.14a–9 (1981). As defined by the Supreme Court:

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important

---

**77.** The Court wishes to make clear that it is not holding that a profit margin of up to 77.3% can never be excessive. In fact, under other circumstances, such a profit margin could very well be excessive. For example, if advisory services being challenged were not of the highest quality and if the directors were not so obviously qualified, fully informed, and conscientious, a similar fee structure could violate section 36(b). This Court is simply holding that on the facts presented here, the fee schedules at issue represent charges within the range of what would have been negotiated at arms-length in the light of all of the surrounding circumstances.

**78.** *See supra* notes 54–66 and accompanying text.

**79.** Having found that the fees at issue are not excessive under section 36(b) of the ICA, there clearly is no waste of corporate assets involved.

**80.** The directors testified that they were not pressured in any way to approve the investment advisory agreements. *See supra* note 68.

**81.** It appears to the Court that the appropriate standard for determining breach of fiduciary

duty in Maryland would be that set forth in *Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.*, 283 Md. 296, 309, 389 A.2d 887, 903 (Md. 1978):

> A fiduciary relationship "carries with it the requirement of utmost good faith and loyalty and the obligation of [the fiduciary] to make full disclosure of all known information that *is significant and material to the affairs* ... of [the fiduciary relationship] ..."

In the Court's view, the defendants have satisfied this standard. *See supra* notes 54–66 and accompanying text.

**82.** Section 20(a) prohibits any person from using a means of interstate commerce to solicit proxies or other authorizations from holders of registered investment company securities in violation of applicable rules and regulations of the Securities and Exchange Commission.

The Court wishes to point out that while plaintiff originally challenged the proxy statements of both 1980 and 1981, plaintiff limited her claim to the 1981 proxy statement at trial. Tr. at 1255.

in deciding how to vote.... Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

For the reasons to follow, the Court finds that the failure to include profitability information from the 1981 proxy statement was not a material omission in violation of section 20(a) of the ICA. Initially, no evidence has been presented that such profitability information is commonly provided in proxy statements by others in the money market industry. Moreover, plaintiff concedes that such information is not required by the Securities and Exchange Commission. Tr. at 56.

The evidence also indicates that a reasonable shareholder would not consider profitability information important when voting on the investment advisory agreement. For example, both of the plaintiff's experts indicated that such information was not important to them in making decisions as shareholders. *See* Tr. at 245 (Professor Bicksler); Tr. at 695 (Mr. Silver). As observed by the district court in *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 528 F.Supp. 1038, 1067 (S.D.N.Y.1981), *aff'd*, 694 F.2d 923 (2d Cir.1982), cost information is generally not material:

> As already mentioned, since shareholder votes would not have been affected by details of costs, none of the points made involve material matter for purposes of this kind of case and the disclosure was ample in view of the burden placed on and satisfied by the Trustees.

Finally, section 20(a) was not violated because the omitted PLPS data was not necessarily accurate, but merely one reasonable way for the Adviser to have estimated profitability. While the Court accepted this study as an approximation of profitability for this litigation, the Court continues to recognize its limitations as a true reflection of the Adviser's cost. "A proxy statement is not defective for failure to include speculative information." *Gartenberg v. Merrill Lynch Asset Management Inc.*, 573 F.Supp. 1293, 1307 (S.D.N.Y.1983), *aff'd*, 740 F.2d 190 (2d Cir.1984). Even plaintiff's expert Mr. Silver testified that an individual investor would not know what to do with profitability information and would be unlikely to understand it without some kind of professional assistance. Tr. at 695. The Court finds that such information would be extremely confusing to the average shareholder and would require extensive discussion of full-cost accounting and the assumptions underlying the PLPS system to be accurate and understandable. The Court is unwilling to impose this type of burden on defendants, particularly in the absence of evidence that such information is useful to the shareholders.

Inasmuch as the Court finds that the omitted profitability information is neither accurate nor significant enough to influence the vote of investors, the Court concludes that no proxy violation occurred in connection with the approval of the 1981 Investment Advisory Agreement.

## CONCLUSION

The Court finds that defendant T. Rowe Price Associates, Inc. did not breach its fiduciary duty by charging excessive fees under section 36(b) of the ICA during the years at issue in this action. In addition, the defendants did not breach any fiduciary duty under Maryland law in connection with the Investment Advisory Agreements of 1979, 1980, and 1981. Finally, the 1981 proxy statements of Prime Reserve Fund disclosed all material facts as required under section 20(a) of the ICA in connection with approval of the Investment Advisory Agreement.

Accordingly, the Court concludes that the amended complaint should be dismissed on the merits. The Clerk is directed to enter judgment for the defendants. Defendants are awarded costs.