740 F.2d 190
 Fed. Sec. L. Rep. P 91,592
Irving L. GARTENBERG, Plaintiff-Appellant,
v.
MERRILL LYNCH ASSET MANAGEMENT, INC., Merrill Lynch, Pierce,
Fenner & Smith Incorporated, Merrill Lynch & Co.
and Merrill Lynch Ready Assets Trust,
Defendants-Appellees.
 No. 1155, Docket 83-7824.
 United States Court of Appeals,
Second Circuit.
 Argued April 30, 1984.
Decided July 25, 1984.
 
 Stanley M. Grossman, New York City (Bruce G. Stumpf, Pomerantz, Levy, Haudek, Block & Grossman, New York City, of counsel) for plaintiff-appellant.
 James K. Manning, New York City (A. Robert Pietrzak, Maria Patterson, Brown, Wood, Ivey, Mitchell & Petty, New York City, of counsel), for defendant-appellee Merrill Lynch Ready Assets Trust.
 Stanley Godofsky, New York City (William P. Rogers, James N. Benedict, Mark Holland, New York City, of counsel), for defendants-appellees Merrill Lynch Asset Management, Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, and Merrill Lynch & Co.
 Before FEINBERG, Chief Judge, MANSFIELD and KEARSE, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 Irving L. Gartenberg appeals from a judgment entered in the Southern District of New York (Milton Pollack, Judge ) dismissing after a full trial on the merits his claim that the defendants violated their fiduciary duty as investment advisers of a registered investment company subject to Sec. 36(b) of the Investment Company Act of 1940, 15 U.S.C. Sec. 80a-35(b),[1] by charging an excessive advisory fee, making material misrepresentations, and failing to disclose relevant information. Gartenberg is a shareholder of the Merrill Lynch Ready Assets Trust ("the fund"), a "no-load" money market mutual fund. The defendants are Merrill Lynch & Co. and two of its wholly owned subsidiaries. Merrill Lynch Asset Management, Inc. ("MLAM" or "the Manager") serves as the Fund's financial adviser, for which it receives an advisory fee calculated on the basis of the Fund's assets. Merrill Lynch Pierce Fenner & Smith, Inc. ("the Broker") processes purchase and redemption orders made by Fund shareholders.
 
 
 2
 This is Gartenberg's second suit on essentially the same claim; the facts of the case are explained in more detail in Judge Pollack's published opinion, familiarity with which is presumed. In Gartenberg v. Merrill Lynch Asset Management, Inc., 528 F.Supp. 1038 (S.D.N.Y.1981), aff'd, 694 F.2d 923 (2d Cir.1982), cert. denied, Andre v. Merrill Lynch Ready Assets Trust, --- U.S. ----, 103 S.Ct. 1877, 76 L.Ed.2d 808 (1983) ("Gartenberg I "), Judge Pollack dismissed the claim that the advisory fee charged the Fund for the period 1980-81 was excessive. This court affirmed, but in so doing stressed that the case turned on the plaintiffs' failure to prove certain facts:
 
 
 3
 Our affirmance is not a holding that the fee contract between the Fund and the Manager is fair and reasonable. We merely conclude that on this record appellants have failed to prove by a preponderance of the evidence a breach of fiduciary duty. Whether a violation of Sec. 36(b) might be established through more probative evidence of (1) the Broker's processing costs, (2) the offsetting commission benefits realized by the Broker from non-Fund securities business generated by Fund accounts, and (3) the "float" interest income gained by the Broker from its method of handling payment on Fund redemptions, must therefore remain a matter of speculation. Indeed, the independent trustees of the Fund might well be advised, in the interests of Fund investors, to initiate such studies.
 
 
 4
 694 F.2d at 933. We also stressed that the plaintiff bears the burden of quantifying the relevant costs and benefits. Id. at 933.
 
 
 5
 Seizing upon the above-quoted language, Gartenberg, three days after our decision was filed, filed this suit alleging a similar claim with respect to the 1982 advisory fee. There was another full trial before Judge Pollack, at which additional evidence of the costs and benefits associated with the Fund was presented. Judge Pollack ruled that Gartenberg had failed to prove that the fee was "so disproportionately large that it bore no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." 573 F.Supp. 1293, at 1315. He also found that plaintiff had shown no misrepresentations or material omissions. Although we reject one aspect of the district court's legal analysis, we are not persuaded that his fact-finding was clearly erroneous and we therefore affirm the judgment.
 
 
 6
 The central issue in this case is the reasonableness of the advisory fee, which turns on whether it is so large that it "bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." Gartenberg I, supra, 694 F.2d at 928. The parties agree that the total revenue to the Manager, including the advisory fee, "float," and "free credit balances," totalled just over $100 million in 1982.[2] This figure does not include any sum for "fall-out" commission income realized annually on non-Fund securities business generated by Fund customers because Peat, Marwick Mitchell and Co. ("PMM") concluded after a careful study that such benefits could not be reliably quantified and that an attempt to do so would be prohibitively expensive.
 
 
 7
 There is no similar agreement, however, as to the magnitude of the costs associated with the Fund. Judge Pollack accepted the $104.5 million figure reached for purposes of this litigation by the defendant's expert, PMM, to which the district court added $2.05 million, representing expenses incurred by the Manager directly on behalf of the Fund, resulting in total costs of $106,580,841.
 
 
 8
 Gartenberg argues that PMM's cost finding is clearly erroneous and that the appropriate cost is the sum of $32,183,696 Merrill Lynch used in its audited financial statements which were certified by Deloitte Haskins & Sells ("DHS"). We disagree. The $32 million represented an artificial estimate adopted for internal purposes in conjunction with Merrill Lynch's CASS accounting system. The CASS system is based on "production credits," which are a function of the commission business associated with a particular product. The Fund is somewhat unique in that it does not generate commissions or production credits. Therefore, an arbitrary figure has to be developed for internal purposes; indeed, there is evidence in the record that the $32 million was generated simply by taking half of the advisory fee of approximately $64 million. All the accountants who testified, including those from DHS, indicated that the CASS number was not an accurate reflection of the total costs associated with the Fund. It is significant, for example, that the $32 million figure does not take into account any allowance for compensation paid to the Broker's account executives for time spent servicing Fund accounts. Since the Fund accounts for some 31% of Merrill Lynch transactions, and the average executive spends 7% of his working day on matters related to the Fund, Judge Pollack correctly ruled that the cost figure must include an allocation of an appropriate portion of executive compensation. For all these reasons we hold that Judge Pollack's acceptance of the PMM cost estimate was not clearly erroneous. Given the concomitant finding that the Fund suffered a net loss of some $5.7 million in 1982, it follows that the district court correctly concluded that the advisory fee for that year was not excessive.
 
 
 9
 We also affirm the district court's rulings on plaintiff's non-disclosure and misrepresentation claims. Gartenberg contends that the statement by the Manager in May 1982 to the independent trustees regarding the CASS system cost figure (approximately $29 million for 1981 and $32 million for 1982) misrepresented the Manager's costs. The statement was as follows:
 
 
 10
 the amount of this item had been determined unilaterally and arbitrarily by Merrill Lynch solely for internal accounting convenience and it had been based upon information derived from the Merrill Lynch CASS system ... [The Manager] did not have an opportunity to discuss the subject with Merrill Lynch and ... [I have] undertaken to assure that future MLAM financial statements would not reflect determinations concerning items of this magnitude and sensitivity that had not been discussed with appropriate MLAM personnel prior to the time the determinations were made.
 
 
 11
 We do not agree that the statement was misleading. The statement, far from being a misrepresentation, is an essentially accurate description of the $32 million estimate.
 
 
 12
 Gartenberg also takes exception to the following statement made in the briefing book furnished by the Manager to the trustees on April 21, 1982:
 
 
 13
 The plaintiffs [in Gartenberg I, which had been decided by the district court and was pending before this court] have particularly emphasized benefits to Merrill Lynch derived from the "float" with respect to redemption checks. You are aware of the means by which Merrill Lynch customers transact share orders through Merrill Lynch. In the case of purchase orders, Merrill Lynch advances immediately available funds to the Trust on behalf of its customers the day after funds are received from the customer even though Merrill Lynch may have received "Clearing House" funds from such customers which may take a considerable time to clear. Because of this practice, and the fact that generally purchases have exceeded redemptions, Merrill Lynch believes that there is no significant net float involved.
 
 
 14
 Although the Manager later learned that there was in fact a positive float, the district court correctly pointed out that the statement "can only be judged on the basis of the information available at the time it was made." 573 F.Supp. at 1304. As of April 21, 1982, no attempt had yet been made to quantify the float, and this court's suggestion that the trustees consider such a study was still eight months off. Under the circumstances, Judge Pollack's holding that there had been no misrepresentation or omission was not clearly erroneous. Finally, we also affirm the district court's rejection of Gartenberg's Sec. 20(a) claim, 15 U.S.C. Sec. 80a-20(a),[3] that the same "misrepresentations" were made in the Fund's proxy statement sent to shareholders.
 
 
 15
 Although we affirm the district court's judgment in all respects, we note that the court has misconstrued the governing legal principle in one respect. In his opinion Judge Pollack stated that "[i]n principle, voluntary float should not be counted as an offset to the processing costs incurred by [the Broker] on behalf of [the Fund]." 573 F.Supp. at 1312. He made a similar comment with respect to free credit balances, which arise when a shareholder instructs his broker to redeem Fund shares but does not immediately tell the broker what to do with the proceeds. The district court apparently attaches significance to the fact that both float and free credit balances are "voluntary" in the sense that shareholders can avoid them entirely by giving instructions and using the Fund's optional check-writing feature, from which he concludes that they should not be treated as a benefit to the Manager. We disagree. As we noted in our earlier opinion, in assessing whether an advisory fee is reasonable a reviewing court must look to all the costs and benefits associated with the Fund. Gartenberg I, 694 F.2d at 931. The fact that float is voluntarily incurred by the shareholders is irrelevant for present purposes;[4] whether or not they are voluntary the Manager realizes a benefit that is both large and predictable. We therefore reiterate our prior holding that all benefits, including float and free credit balances, are to be considered in evaluating the reasonableness of an advisory fee.
 
 
 16
 For the foregoing reasons the judgment of the district court is affirmed.
 
 
 
 [1]
 Sec. 36(b) provides in relevant part that
 the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.
 
 
 [2]
 The "float" is a term used to describe interest income earned by the Broker from the time when a redemption check is issued by the Fund to its customer until the date the check clears. "Free credit balances" are similar to the float, representing uninvested funds held for an investor, which earn no interest for the shareholder because he has not reinvested them in the Fund but may generate interest income for the Fund
 Plaintiffs' expert (Gunn) testified that the "float" benefits accruing to the Manager were $14 million. However, plaintiff later abandoned this figure in favor of the $26.5 million figure adopted by Merrill Lynch's expert (Peppet).
 
 
 [3]
 Sec. 20(a) provides that
 It shall be unlawful for any person, by use of the mails or any means or instrumentality of interstate commerce or otherwise, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security of which a registered investment company is the issuer in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 
 
 [4]
 We do note that a shareholder's decision to redeem shares in a manner that generates a float benefit to Merrill Lynch is not always voluntary. The optional checkwriting feature, for example, can be used only to write checks in the amount of $500 or more