**Jeffrey KRINSK, Plaintiff–Appellant,**

v.

**FUND ASSET MANAGEMENT, INC., Merrill Lynch Asset Management, Inc., Merrill Lynch, Pierce, Fenner & Smith Inc., Merrill Lynch & Co., Inc., CMA Money Fund, Defendants–Appellees.**

**No. 623, Docket 88–7729.**

United States Court of Appeals, Second Circuit.

Argued Jan. 9, 1989.

Decided May 31, 1989.

Richard M. Meyer, New York City (Melvyn I. Weiss, George A. Bauer III, Milberg Weiss Bershad Specthrie & Lerach, New

York City, of counsel), for plaintiff-appellant.

James N. Benedict, New York City (William P. Rogers, Mark Holland, Jordan D. Cooper, Barry W. Rashkover, Rogers & Wells, New York City, of counsel), for defendants-appellees Fund Asset Management, Inc., Merrill Lynch Asset Management, Inc., Merrill Lynch, Pierce, Fenner & Smith Inc. and Merrill Lynch & Co., Inc.

James K. Manning, New York City (Paul Windels III, Brown & Wood, New York City, of counsel), for defendant-appellee CMA Money Fund.

Philip L. Kirstein, Sr. Vice President and General Counsel, Merrill Lynch Asset Management, Inc., Plainsboro, N.J., on brief of defendants-appellees.

Before VAN GRAAFEILAND and MINER, Circuit Judges, and LASKER, District Judge.[*]

MINER, Circuit Judge:

Plaintiff-appellant Jeffrey Krinsk is a shareholder in the CMA Money Fund ("Fund"), which is one component of the Cash Management Account program ("CMA program"), a financial services package offered by Merrill Lynch, Pierce, Fenner & Smith Inc. ("MLPF&S"). He brought this action derivatively on behalf of the Fund against the Fund itself and those MLPF&S-related entities responsible for administering and servicing the Fund. In his amended complaint, Krinsk pleaded violations of sections 12(b), 15(a), 20(a) and 36(b) of the Investment Company Act of 1940 ("Act"), 15 U.S.C. §§ 80a–12(b), 80a–15(a), 80a–20(a), 80a–35(b) (1982), and demanded a jury trial. Krinsk alleges a breach of fiduciary duty in that the fees paid by the Fund and its shareholders are excessive; attacks the 12b–1 distribution plan as being improper; and contends that a proxy statement of the Fund was false and misleading in regard to defendants' profitability and in comparing fees of the Fund with those of another fund.

The district court rejected all of Krinsk's claims, granting pre-trial dismissal of two claims and dismissal of the remaining claims after a bench trial. Krinsk appeals from the final judgment dismissing the amended complaint.

We find no error in the district court's determination that Krinsk failed to prove that the fees are disproportionately large. In addition, we agree with the district court that there can be no private right of action under section 12(b) when the claim is indistinguishable from a section 36(b) claim; that the section 15(a) claim fails because that claim must be asserted by the shareholders rather than the Fund; that the omission in the proxy statement is not material; and that a jury trial properly was denied because the claims sound in equity.

Accordingly, we affirm.

## BACKGROUND

### The CMA Program and the Fund

The CMA program was introduced by MLPF&S in 1977 and has been widely imitated since that time. It consists of a bundle of financial services administered through a central asset account that combines (1) a securities trading account, (2) a savings vehicle, consisting of one of three money market funds (one of which is the Fund) or an insured savings account, (3) a VISA debit card, (4) check-writing privileges and (5) a detailed monthly statement. The focal point of the CMA program is the securities account, which generates substantial revenue for MLPF&S. The program links the securities account to the savings vehicle through a "sweep" feature that automatically transfers idle cash into the savings vehicle—credit balances of $1,000 or more are transferred into savings the day after receipt; balances of less than $1,000 are swept weekly. An initial deposit of $20,000 is required to open a CMA program account, but a minimum balance thereafter need not be maintained.

[*] Hon. Morris E. Lasker, United States District Court for the Southern District of New York, sitting by designation.

The subject of this lawsuit, the Fund, is a no-load, diversified, open-ended investment company and thus subject to provisions of the Act. The Fund is the largest registered money market mutual fund, with approximately $19 billion in assets and over 850,000 shareholders as of January 1987. Investors in the Fund hold their investment as shares, on which dividends are declared and reinvested daily. Participation in the CMA program is required in order to invest in the Fund. Participants in the program, however, are not required to invest in the Fund and instead may designate one of the other savings vehicles as their primary savings account.

Other components of the CMA program—the VISA debit card and check writing privileges—are linked to the savings vehicle and securities account, providing immediate access to money in the Fund and to margin credit. Thus, when a customer's check or VISA transaction clears, the debt is first paid out of any free credit balance, then out of the Fund or other savings vehicle and, finally, from the margin loan value in the securities account.

MLPF&S, the sponsor of the CMA program, is the largest securities firm in the United States. It acts as a distributor for the Fund and services the individual CMA program accounts. The day-to-day management of the Fund is performed by Merrill Lynch Asset Management, Inc. ("MLAM"), which serves as investment adviser to approximately forty to fifty mutual funds as well as to institutional and individual investors. Both MLPF&S and MLAM are owned by Merrill Lynch & Co., Inc. ("ML&Co."). The Fund's investment adviser is Fund Asset Management, Inc. ("FAM"), a wholly-owned subsidiary of MLAM. These companies—MLPF&S, MLAM, ML&Co. and FAM (collectively "Merrill Lynch")—are the defendants-appellees in this action along with the Fund.

To service the accounts, MLPF&S employs financial consultants, who act as its sales representatives to investors. Supporting the financial consultants are sales assistants, an extensive "back office" oper-ation and the services of other Merrill Lynch affiliates and subsidiaries.

Direct compensation for services and management comes from three fees: (1) a $65 annual service fee paid by each CMA program participant to MLPF&S; (2) an investment advisory fee paid by the Fund to FAM based on the Fund's asset level; and (3) payments made by the Fund to MLPF&S pursuant to a 12b–1 plan, under which the payments are passed on almost entirely to the financial consultants.

Although all program participants are obliged to pay the service fee, approximately 25% of them do not invest in the Fund. The second fee, the advisory fee, is based on a schedule of declining percentages as assets increase beyond certain breakpoints: 0.5% of the average daily value of net assets under $500 million, 0.425% of that amount between $500 million and $1 billion, and 0.375% of that amount in excess of $1 billion. The third fee, paid pursuant to the 12b–1 plan, is based on a distribution each month at an annual rate of 12.5 basis points (0.125% of the Fund's assets), which MLPF&S passes through to the financial consultants, save for 1 basis point that it pays to sales management and up to .50 of a basis point retained for administrative costs of the program.

The Fund is governed by a Board of Trustees, comprised of one affiliated trustee and six independent trustees. The unaffiliated trustees have joined the Board at the invitation of Merrill Lynch, and each acts as a trustee or director of one or more of Merrill Lynch's other mutual funds. The Board oversees the investments and administration of the Fund, and evaluates the advisory fee annually and the 12b–1 plan quarterly. The district court found, and the parties do not dispute, that the trustees were at all times fully informed on matters relevant to the issues underlying this litigation.

The investment advisory fees of the Fund have been approved by the shareholders. In July of 1984, defendants mailed to the shareholders a proxy statement, one of the principal purposes of which was to obtain shareholder approval of the continu-

ance of the investment-advisory fee agreement. The proxy statement set forth the three-tier schedule of the Fund's advisory fee. It listed also all the other investment companies for which FAM and MLAM act as investment advisers. The list included two columns, indicating for each of the listed companies its "Rate" and "First Breakpoint." The first of the listed money market funds was Merrill Lynch's Ready Asset Trust ("RAT"), with a listed rate of 0.5% and first breakpoint at $500 million, the same percentage and breakpoint as the Fund. The statement failed to indicate, however, the relevant differences between the RAT and the Fund—that RAT had no service fee (as opposed to the then–$50 annual charge for participation in the Fund's program) and had seven breakpoints (as opposed to the Fund's three). Also omitted in the statement was the fact that the annual rate of the advisory fee of the RAT effectively was 0.34% as opposed to 0.38% for the Fund.

*The District Court Proceedings*

Krinsk brought this action derivatively on behalf of the Fund against the Merrill Lynch defendants and the Fund. The suit was filed in the United States District Court for the Southern District of California on May 16, 1985, and was transferred in October of that year to the Southern District of New York, where it was assigned to Judge Walker. A jury trial was demanded in the amended complaint, which alleged that: (1) FAM and MLPF&S breached their fiduciary duties to the Fund by taking excessive fees, in violation of section 36(b) of the Act, 15 U.S.C. § 80a–35(b); (2) the distribution agreement and plan entered into and continued by the Fund violates section 12(b) of the Act, 15

U.S.C. § 80a–12(b), and Securities and Exchange Commission ("SEC") Rule 12b–1, 17 C.F.R. § 270.12b–1; (3) the annual service fee required for all program participants is not authorized by a written advisory agreement, as required by section 15(a) of the Act, 15 U.S.C. § 80–15(a); and (4) the Fund's 1984 proxy statement was materially false and misleading in omitting relevant differences between the RAT and the Fund, thus violating section 20(a) of the Act, 15 U.S.C. § 80a–20(a).[1]

In a series of comprehensive and well-reasoned opinions, Judge Walker rejected all of Krinsk's claims. The court dismissed before trial the section 12(b) claim because it was indistinguishable from the section 36(b) claim and its allowance would have permitted a circumvention of the procedural limitations of section 36(b). *Krinsk v. Fund Asset Management, Inc.,* 654 F.Supp. 1227, 1234 (S.D.N.Y.1987). The court similarly dismissed the section 15(a) claim on the ground that the claim belonged properly to the shareholders, not to the Fund through which Krinsk derivatively brought the action. *Id.* at 1234–35. The court denied a jury trial as to the remaining claims because they sounded in equity. *Id.* at 1235–36.

After a bench trial, the court dismissed the section 36(b) claim because Krinsk failed to prove that the advisory fee was disproportionately large. *Krinsk v. Fund Asset Management, Inc.,* [1987–1988 Transfer Binder] F.Sec.L.Rep. (CCH) ¶ 93,812, at 98,896, 715 F.Supp. 472 (S.D.N.Y.1988). Finally, the court dismissed the section 20(a) claim, holding that the omission in the proxy statement was immaterial. *Id.*[2]

1. In a fifth cause of action it was alleged that MLPF&S, MLAM and ML&Co. were controlling persons under the Act and, under section 48 of the Act, were liable for the wrongs they caused. *See* 15 U.S.C. § 80a–47 (1982). In light of the disposition hereafter made, no further discussion of this claim is necessary.

2. Two earlier determinations of the district court are not the subjects of appeal. In the first, the court, declining to find the one-year statute of limitations of section 36(b)(3) of the Act tolled, dismissed that part of the action that

claimed under section 36(b) the recoupment of alleged excessive fees paid more than one year prior to the commencement of the action. *Krinsk v. Fund Asset Management, Inc.,* [1986–1987 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,730, at 93,546, 1986 WL 205 (S.D.N.Y. May 1, 1986). In the second, defendants' motion for sanctions under Fed.R.Civ.P. 11 was denied. *Krinsk v. Fund Asset Management, Inc.,* No. 86 Civ. 8428, 1986 WL 5630 (S.D.N.Y. filed May 9, 1986). Following the issuance of these two opinions, Krinsk amended his complaint.

Krinsk raises substantially the same issues on appeal. For the reasons that follow, we agree with the district court.

## DISCUSSION

### 1. *Section 36(b)*

■ Section 36(b) of the Act places on the investment adviser of a registered investment company a fiduciary duty with respect to the receipt of compensation for services paid by the investment company or by the securities holders.[3] Krinsk contends that the trustees neglected this duty by taking excessive fees from the Fund. He notes that lower fees are paid by the RAT fund, which is the second largest investment company affiliated with Merrill Lynch and the only fund comparable in size to the CMA Fund. He observes that despite the Fund's enormous growth, there has been no decrease in the advisory fee rate since 1979, and the rate never has been scaled down beyond the $1 billion breakpoint. He highlights as well the indirect benefits that Merrill Lynch derives from the CMA program: "non-fee-based" revenues and expenses generated from other services integral to the program, such as securities trading and margin interest; and "fall-out" benefits, such as profits made by a Merrill Lynch subsidiary from trading with the Fund.

Krinsk proposes that the trustees had a duty to negotiate for the Fund the "best deal" possible. However, the standard to apply in determining whether compensation for managing a mutual fund violates the fiduciary duty imposed by section 36(b) is "whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances." *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 928 (2d Cir.1982), *cert. denied*, 461 U.S. 906, 103 S.Ct. 1877, 76 L.Ed.2d 808 (1983) (*"Gartenberg I"*). To violate section 36(b), "the

adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered." *Id.*

■ The following factors are to be considered in applying this standard: (a) the nature and quality of services provided to fund shareholders; (b) the profitability of the fund to the adviser-manager; (c) fall-out benefits; (d) economies of scale; (e) comparative fee structures; and (f) the independence and conscientiousness of the trustees. *See id.* at 929–30. These factors, considered below *seriatim*, all weigh in favor of Merrill Lynch.

### A. Nature and Quality of Services

Krinsk does not dispute that the services provided by Merrill Lynch have been only of the highest quality. From 1984 to 1986, the Fund had the third best performance out of 56 prime money funds, with an annual rate of return of 8.4% as compared to the industry average of 8%. During the same years, the Fund ranked second among the nine money market funds associated with central asset accounts.

■ Krinsk suggests that, because the Fund invested in high-risk items that generally are more profitable, the Fund's performance should be analyzed on a "risk-adjusted" basis. According to Krinsk, the Fund's performance would be below average when adjusted to compensate for the risk. Krinsk's expert conceded, however, that neither the SEC nor the money market industry has adopted "risk adjusted performance" as an industry standard. ¶ 93,812, at 98,906. The district court was unwilling to impose on Merrill Lynch a performance standard "yet to be accepted" by the SEC. *Id.* The court thus did not err in rejecting that standard.

Krinsk contends also that the Fund's performance is artificially high because the $65 annual CMA program fee was not in-

**3.** Section 36(b) provides in relevant part that the investment advisor of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company or by the security holders thereof, to such investment advisor or any affiliated person of such investment advisor. 15 U.S.C. § 80a–35(b).

cluded as a Fund expense when calculating the Fund's yield. The district court did not err in rejecting this argument. The fee is not paid by the Fund, but by all the participants in the program regardless of whether they invest in the Fund. Furthermore, Merrill Lynch presented evidence, apparently uncontradicted by Krinsk, that leading industry publications exclude such annual program fees in their computation of yields and expense ratios. The expert witness for Merrill Lynch also testified he knew of no money market fund that refers to such charges when reporting to the SEC the yields and expense ratios.

### B. Profitability to Merrill Lynch

Krinsk claims that the Fund is highly profitable to Merrill Lynch, and more profitable than Merrill Lynch admits because costs attributed to the Fund should be attributed to the CMA program. Krinsk further suggests that "excessive profitability alone should suffice to support a finding of unreasonableness." He cites to no case in support of this proposition, however, and in fact courts "must look to *all* the costs and benefits associated with the Fund," *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 740 F.2d 190, 194 (2d Cir.1984) ("*Gartenberg II*").

Because the Fund is an integral part of the CMA program, it is difficult to calculate the revenues and expenses associated with the Fund apart from those associated with the other aspects of the CMA program. Merrill Lynch's accounting firm and expert at trial, Peat Marwick Mitchell & Co. ("PMM"), therefore developed a "fee-based" analysis, which subtracted fee costs from fee revenues in an effort to determine the profits derived by Merrill Lynch from the Fund. The fee revenues of the study include the CMA program participation fee, the advisory fee and VISA fees; the fee costs include, for example, portfolio management costs, the costs of operations and systems functions (including the sweep and checking/VISA functions), and administrative costs. Defendants introduced at trial an additional study, which they themselves prepared, that was similar to the PMM study. Krinsk had no independent

profitability study prepared, but criticized the PMM and Merrill Lynch studies. The district court accepted none of the studies in full, recognizing that "[c]osts within the CMA program must be properly allocated in any profitability study lest the Fund subsidize the costs of Merrill Lynch's commission-generating activities," ¶ 93,812, at 98,908. The court therefore made its own determinations as to costs and profitability. We agree with those determinations:

#### (1) *12–b1 Plan Fees*

The 12–b1 plan fees, as stated above, are monthly distributions to MLPF&S personnel based on the net assets in the Fund. The plan was instituted as an incentive to spur the sale of Fund shares and to stimulate improved shareholder service. These fees are paid through MLPF&S directly to its employees, except for deductions for management and administration, and are not recorded on any of defendants' audited financial statements.

The district court treated these fees in the same way as did PMM, namely, as a wash, offset by the cost of payments to the personnel. Krinsk, however, argues that because, in his view, the plan did not achieve its stated purpose—the sale of fund shares—the fees should be counted as revenue to MLPF&S with no offsetting expenses. Since the district court found that Krinsk "failed to demonstrate that the 12b-1 payments have not contributed to the growth of the Fund," *id.* at 98,908 n. 37, and Krinsk's own expert conceded that considering the 12b-1 payments as a fee-based cost was "within the realm of reason," we cannot say that the court's treatment of those fees was "clearly erroneous," *Gartenberg II*, 740 F.2d at 192.

#### (2) *Other Costs*

Krinsk attacks numerous aspects of the PMM study and the district court's findings as to systems costs, overhead, declines and overrides, CMA marketing and the allocation of certain costs to the securities side as opposed to the Fund side. Determination of these matters, involving extensive

analysis of factual data, is best left to the discretion of the district court, which held a two-week trial to resolve the factual questions. There is ample evidence to support the district court's findings on these issues, and Krinsk does not advance any convincing argument that the district court erred.

### (3) *Measure of Profitability*

Krinsk disputes Merrill Lynch's measure of profitability and offers instead a "return on equity" analysis utilizing a "Dupont formula." The application of the formula was flawed, however, by a speculative approach and lack of crucial figures.[4] Krinsk offers also a "yardstick" analysis that compares the return on equity of the Fund with the return from other segments of the financial services industry, such as banks, insurance companies and companies dealing with stocks and bonds. According to this formula, the Fund reaps a lower return because its fee-based activities are relatively stable. Not accounted for in this formula, however, is the Fund's connection to the CMA program, which provides a variety of financial services. Moreover, the yardstick formula would reduce the Fund's advisory fee to a level far below that of any other mutual fund. The unreasonable result of applying this formula casts suspicion on the formula itself. We therefore cannot fault the district court for rejecting Krinsk's theories and crediting the testimony of Merrill Lynch's expert.

### C. Fall-out Benefits

█ Krinsk argues that fall-out benefits should include all securities commission and margin revenues from CMA accounts, even if the benefits would have come to Merrill Lynch absent the existence of the Fund (or the CMA program). The district court rejected this definition as too broad. In *Gartenberg II*, a suit attacking Merrill Lynch's RAT fund, Judge Pollack characterized fall-out benefits as the "commissions received by [MLPF&S] that would not have been earned *but for* the fact that [MLPF&S] was able to solicit [RAT fund]

shareholders." 573 F.Supp. 1293, 1313 (S.D.N.Y.1983) (emphasis added), *aff'd*, 740 F.2d 190 (2d Cir.1984). Krinsk urges rejection of that approach, noting that our Circuit does not require "but for" causation for costs to be offset with income from "voluntary" float benefits and free credit balances. *See Gartenberg II*, 740 F.2d at 194. However, float benefits and free credit balances are generated directly by the money market fund and cannot be characterized as fall-out revenue. *See* 573 F.Supp. at 1312–13.

### D. Economies of Scale

Krinsk alleges that Merrill Lynch's expenses, in terms of a percentage of fee-based revenues, have declined as a result of the Fund's asset growth. He argues that the Fund should receive the benefit of this economy of scale. The district court noted, however, that the fact that "expenses ... declined at a time when the Fund size grew ... does not establish that such decline was necessarily due to economies of scale." ¶ 93,812, at 98,913. Rather, to show economies of scale, plaintiff bore the burden of proving that the per unit cost of performing Fund transactions decreased as the number of transactions increased. *See Gartenberg I*, 528 F.Supp. 1038, 1055 (S.D.N.Y.1981), *aff'd*, 694 F.2d 923 (2d Cir.1982), *cert. denied*, 461 U.S. 906, 103 S.Ct. 1877, 76 L.Ed.2d 808 (1983). Krinsk offered no such evidence. Merrill Lynch, in contrast, offered evidence that the per unit costs for most money market funds generally do not decrease as a fund grows. As the Merrill Lynch view is not unreasonable, *see id.* (per unit cost of providing shareholder services remained relatively stable), we cannot say the district erred in finding that Krinsk failed to sustain his burden of proof.

### E. Comparative Expense Ratios and Advisory Fees

The district court found that the Fund's expense ratio and advisory fee are not only

---

**4.** The "Dupont formula" calculates return on equity by multiplying profit margin by asset turnover by leverage. Krinsk's expert lacked the asset turnover and leverage figures for the Fund or the CMA Program, and used instead figures for ML&Co.

consistent with the industry norms, but have been among the lowest of any mutual fund in the industry. Krinsk does not dispute these findings, but instead argues that a general comparison of fees is of limited use. Indeed, we have cautioned against providing much weight to this type of comparison. *See Gartenberg I,* 694 F.2d at 929. According to Krinsk, the only viable comparison of fees would be to a fund comparable in size to the CMA Fund, and the only such fund is Merrill Lynch's RAT. That fund has an effective advisory fee that is 10% less than the CMA advisory fee. Unlike the CMA Fund, however, the RAT is a stand-alone fund, where the investors do not derive the many benefits of the central asset account.

Additionally, the district court allowed Merrill Lynch to exclude the service fee from the computation of the Fund's yield. Krinsk argues that it is inconsistent to consider benefits arising from the program components that are ancillary to the Fund to allow a higher fee, and yet not attribute that fee as a cost to the Fund. Where a money market fund is embedded in a central asset account, the apportionment of the costs and benefits is, as the district court recognized, "an art rather than a science." ¶ 93,812, at 98,907. Since the fee under consideration is paid by non-shareholders of the Fund as well as shareholders, we are not prepared to say that the district court erred in allowing Merrill Lynch to exclude the fee from the computation of yield.

### F. Trustees' Approval

■ The expertise of the trustees, whether they are fully informed, and the extent of care and conscientiousness with which they perform their duties are among the most important factors to be examined in evaluating the reasonableness of compensation under section 36(b). *See Gartenberg I,* 694 F.2d at 930. Krinsk cannot dispute the district court's finding that the trustees were qualified and well-informed. Krinsk, however, attacks the independence and deliberations of the trustees, alleging that they did not act at arm's length, did not conclude that the 12b–1 plan would

benefit shareholders before voting for it, did not consider profitability to Merrill Lynch, and were more concerned about the CMA program than the Fund of which they were the trustees. He notes, for instance, that the trustees did not fine-tune the advisory fee, as there is no breakpoint beyond $1 billion in the advisory fee schedule.

The evidence amply supports a finding that the trustees were independent and exercised care in their deliberations. For example, when the trustees were not satisfied with the profitability study Merrill Lynch prepared, they required the study to be redone. The trustees also did not violate their fiduciary duties in approving the 12b–1 incentive fee; in fact, the fee seems to have benefitted the shareholders. As a result of the creation of competing bank funds, the CMA Fund had lost approximately 25% of its assets in 1982. The 12b–1 fee was adopted to counteract this erosion of assets. By providing an incentive for the sale of shares, the 12b–1 plan created a positive cash flow for the Fund, enabling the manager to improve the Fund's performance. That the plan has had the added effect of raising morale of MLPF&S financial consultants and consequently improving the quality of services to existing Fund shareholders is no reason to deem the plan, or the motives of the trustees, improper. *Cf. Meyer v. Oppenheimer Management Corp.,* 764 F.2d 76, 84–85 (2d Cir.1985), *on remand,* 707 F.Supp. 1394 (S.D.N.Y.1988). Accordingly, the district court did not err in finding that the trustees were independent and that they deliberated conscientiously.

### 2. *Section 12(b)*

■ Section 12(b) mandates that an investment company acting as a distributor of its own securities comply with the rules and regulations promulgated thereunder by the SEC. 15 U.S.C. § 80a–12(b). Under Rule 12b–1, the investment company directors are held to the fiduciary standards of section 36 when they consider whether to implement or continue a distribution plan, such as the 12b–1 plan at issue here. 17 C.F.R. § 270.12b–1 (1988).

Krinsk complains that the Fund's 12b–1 plan violates section 12(b) and SEC Rule 12b–1 in that the amounts paid by the Fund are based on the entire asset base regardless of whether any additional shares are sold. This claim, however, is a reincarnation of his "excessive fee" argument, and thus is indistinguishable from the section 36(b) claim, which encompassed the 12b–1 plan.[5] To allow this claim, which is cognizable under section 36(b), to be brought under section 12(b) would be to allow circumvention of the following specific procedural limitations of section 36(b), *see Tarlov v. Paine Webber Cashfund, Inc.*, 559 F.Supp. 429, 437 (D.Conn.1983): damages may be recovered only against the recipient of the compensation, are limited to the amount of compensation, and may not be recovered for any period prior to one year before the commencement of the action, *see* Act § 36(b)(3), 15 U.S.C. § 80a–35(b)(3). The district court did not err in finding that this circumvention would be impermissible.

### 3. *Section 15(a)*

■ Section 15(a) of the Act provides that no one may serve as investment adviser to a fund "except pursuant to a written contract" that "precisely describes all compensation to be paid thereunder." 15 U.S.C. § 80a–15(a). Krinsk alleges that Merrill Lynch violated this section because the $65 CMA program participation fee is not mentioned in a written agreement between the Fund and MLAM.

The first defect in Krinsk's claim is, as the district court noted, that Krinsk did not and cannot allege that the fee is advisory compensation. It is paid not to MLAM or the FAM, but to MLPF&S for program services. In *Gartenberg I*, Judge Pollack dismissed a similar section 15(a) claim against MLPF&S on the ground that MLPF&S was not an investment adviser. *See* 528 F.Supp. at 1066. Likewise, the fee

here is paid to MLPF&S, which is not the investment adviser.

The second reason the claim fails is that it is not the proper subject of a derivative action. The fee is paid by the individual participants, not the Fund. Because the fee "flow[s] directly from the investor …[,] the investor … is the proper party to assert this action, not the Fund, nor the plaintiff shareholder on behalf of the Fund," *Cohen v. Fund Asset Management, Inc.*, [1981–1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,433, at 92,571–92,572 (S.D.N.Y. Mar. 31, 1980).

### 4. *Proxy Statement under Section 20(a)*

■ Section 20(a) and Rule 20a–1 thereunder forbid solicitation of proxies containing any materially false or misleading statement or omission. 15 U.S.C. § 80a–20(a); 17 C.F.R. § 270.20a–1(a) (1987) (incorporating the restrictions of SEC Rules governing Securities Exchange Act of 1934 § 14(a), 15 U.S.C. § 78n(a) (1982)). The plaintiff must establish that "there is a substantial likelihood that a reasonable shareholder would consider [the omitted fact] important in deciding how to vote," *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *see Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F.Supp. 962, 989–90 (S.D.N.Y.) (adopting *Northway* rule to claim under Section 20(a)), *aff'd*, 835 F.2d 45 (2d Cir.1987) (per curiam), *cert. denied*, —— U.S. ——, 108 S.Ct. 1594, 99 L.Ed.2d 908 (1988).

The district court dismissed this claim following trial, apparently agreeing with Merrill Lynch that because the CMA Fund and the RAT are so different, comparisons would confuse rather than assist an investor, and that the omission was immaterial. We agree. The proxy statement listed the "First Breakpoint" and, in so doing, alerted the reader that there could be other breakpoints. In no way does the statement im-

---

**5.** Krinsk does not allege that the plan fails to conform with the mechanical requirements of Rule 12b–1(b), a claim that might be a section 12(b) action independent of an action under section 36(b). *See Meyer*, 764 F.2d at 85. Had Krinsk raised such a claim, we might be forced to reach the issue whether there exists generally a private right of action under section 12(b), *see id.*, in light of the fact that the section, unlike section 36(b), contains no words expressly providing for a private right of action. We leave that issue, however, for another day.

ply that these other breakpoints, if existing, would be the same. In fact, the reader would not assume from the face of the statement that for any given fund there are other breakpoints at all, as there are forty-two funds of various sizes listed under the column and some lack any breakpoint. Also, the statement cautioned that "investors seeking solely to invest cash in a money fund ... should consider as a more suitable investment other money funds." Finally, the RAT fees were readily available, for instance, on the RAT proxy statements. This claim properly was dismissed.

5. *Jury Trial*

██ Krinsk contends that he was entitled to a jury trial on his sections 36(b) and 20(a) claims. As to the section 36(b) claim, a jury trial would have been improper "[s]ince the [section 36(b)] claim allege[d] nothing which would entitle plaintiff to a remedy other than equitable restitution." 654 F.Supp. at 1236. Although Krinsk insists his claim was for damages, a claim under section 36(b), even when labeled as one for damages, ordinarily should be treated as an equitable claim not for a jury. *See Schuyt,* 835 F.2d at 46 ("[t]he mere fact that [plaintiff] has designated the relief she [sought under 36(b)] as 'damages' does not mean that she is automatically entitled to a jury trial"). The complaint here, as in *Schuyt,* alleges a breach of fiduciary duty arising out of excessive fees. *See id.* In such a case, involving no claim of fraud, the remedy would be equitable and a jury trial improper. *See id.*

Likewise, Krinsk is not entitled to a jury trial for his section 20(a) claim, even though he seeks damages. As the district court correctly noted, "a proxy misrepresentation that results in the continuation of a contract for advisory fees ... would lead to equitable relief, such as an order to hold a new shareholders vote upon corrected proxy materials, recission or reformation of the agreement and restitution of excessive fees." 654 F.Supp. at 1236; *see also Schuyt,* 835 F.2d at 46 (denying jury trial where plaintiff's section 20(a) claim "in essence, seeks recission of the advisory agreements ... and restitution and is thus equitable in nature").

### CONCLUSION

The judgment of the district court is affirmed.